SEALED

FILED

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of California

JUL 01 2015

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

In the Matter of the Search of  )
)
SINGLE STORAGE UNIT #585  )
LOCATED AT 2033 BROADWAY STREET  )
VALLEJO, CALIFORNIA 94589  )
)

Case No.

**2: 1 5 - SW - - 3 8 2**    **CKD**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the        Eastern        District of        California        , there is now concealed *(identify the person or describe the property to be seized):*

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1201 | Kidnapping |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☐ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested

☐ under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

JASON R. WALTER, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:        July 1 2015

_____
*Judge's signature*

City and state:   Sacramento, California

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## FOR A SEARCH WARRANT

I, Jason R. Walter, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT QUALIFICATIONS

1.       My June 29, 2015 Affidavit in Support of Application for Search and Arrests Warrants is true and incorporated herein and attached for the Court's reference.

### PROBABLE CAUSE

2.       On June 30, 2015, at approximately 1:25 p.m., during the execution of a federal search warrant at 2710 Genoa Drive in South Lake Tahoe, California, for evidence of the kidnapping of VICTIM F, Special Agent (SA) Marcus Knutson, who is a member of the FEDERAL BUREAU OF INVESTIGATION's (FBI) Evidence Response Team (ERT), located several evidentiary items relating to the kidnapping of VICTIM F.  FBI recovered a "zip-tie" from under the master bed, and zip-tie had a blonde hair attached to it.  FBI recovered a piece of cardboard that looks like it was the cardboard that covered a room window in one of the photos that the anonymized kidnapper emails linked to.  Agents also observed adhesive marks where the cardboard appeared to have been taped to the wall.  Agents also observed that the storage shed was set up consistently with the photo which depicted the cache of electronics and burglary equipment that was linked to in one of the emails, though the electronics and burglary equipment were missing. Also during the execution of the federal search warrant of the stolen white 2011 Ford Mustang, a blood pressure cuff was seized, which was described by both VICTIM M and VICTIM F to have been used on them by the kidnappers after they were given the liquid described as cold medicine.

3.       At approximately 2:00 p.m., the stepfather and mother of MATTHEW MULLER and homeowners of the searched address, arrived to the residence and met with SA David Sesma

as the Evidence Response Team was completing the search. It was during this time that upon questioning by SA Sesma, that the step father stated that MATTHEW MULLER's father, who shares MATTHEW MULLER's surname, arrived at 2710 Genoa Drive "two weeks ago" and took custody of MATTHEW MULLER's remaining personal items from the residence. The step father further stated that MATTHEW MULLER had a storage unit in Vallejo, California, under MATTHEW MULLER's mother's name.

4.     At approximately 4:45 p.m., SA Jason Walter and Task Force Officer (TFO) Troy Oviatt arrived at the residence of the stepfather. They asked about the whereabouts of MATTHEW MULLER's items and received no answer.

5.     At approximately 6:26 p.m., Vallejo Police Department Detective William Badour (also a FBI Task Force Officer) contacted the CENTRAL SELF STORAGE located at 2033 Broadway Street in Vallejo, California, and asked if MATTHEW MULLER had ever rented a storage unit at that facility. The property manager advised TFO Badour that MATTHEW MULLER has a unit and has rented it since September of 2014. A uniformed Vallejo police officer arrived at the CENTRAL SELF STORAGE a short time later and was advised by the property manager that MATTHEW MULLER currently rents unit #585.

## CONCLUSION

I submit that this affidavit supports probable cause of evidence of violations of 18 U.S.C. §1201, for a search warrant authorizing the search of MULLER's rental storage unit located at CENTRAL SELF STORAGE, 2033 Broadway Street in Vallejo, California, described in Attachment A, for the evidence and fruits of crime set forth in Attachment B.

## SEALING

The investigation is ongoing. There may be more storage units. Further, although MATTHEW MULLER is in custody, there are others who could, if they decided to ignore

warnings, still sequester or destroy evidence.  I therefore ask that the filings in this case remain under seal except that the warrant may be served during the execution.

Respectfully submitted,

Jason R. Walter
Special Agent, FBI

Subscribed and sworn to

Before me on July 1, 2015

Hon. CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

Approved as to Form:

MATTHEW D. SEGAL
Assistant United States Attorney

3

## ATTACHMENT A

The following storage unit:

Single storage labeled as unit #585

Located at:

2033 Broadway Street, Vallejo, California 94589

**ATTACHMENT B**

Evidence of violation of 18 U.S.C. § 1201, including:

1. Hairs
2. Fibers
3. DNA
4. Blood
5. Fingerprints
6. Indicia of ownership
7. Bindings
8. Tape
9. Curtains
10. Sheets
11. Bedding
12. Night stands
13. Gloves
14. Lasers
15. Flashlights
16. Goggles
17. Headphones
18. Pillows
19. Nyquil
20. Medicine
21. Pill Bottles
22. Recording devices
23. Cameras
24. Cellphones
25. Video Cameras
26. Computer equipment
27. Hard Drives
28. Thumb Drives/USB Drives
29. Routers
30. Web cams
31. Stored data on any GPS device indicating locations searched, directions given, and locations traveled to and/or through
32. Any written or electronic document referring to Denise Huskins, Aaron Quinn, Henry Lee, Kenny Park. Andrea Roberts, Vallejo Police Department, or the FBI.
33. Any written or electronic document related to planning or execution of any home invasion, kidnapping, or theft, as well as any "workup" of personal information any potential victim

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## FOR A SEARCH WARRANT AND AN ARREST WARRANT

I, Jason R. Walter, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT QUALIFICATIONS

1.      I am employed by the Federal Bureau of Investigation (FBI) as a Special Agent. As a Special Agent of the FBI, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States. I have been employed by FBI since 2013 and am currently assigned to the Fairfield Resident Agency of the Sacramento Field Division as the Task Force Coordinator of the Solano County Violent Gang Safe Streets Task Force, which investigates violent crime in Solano County. Included in my duties is the enforcement of all laws related to violent crime including, but not limited to kidnapping or providing false statements of such crimes. Prior to this I was a Deputy Sheriff and Detective with the Douglas County Sheriff's Office in Southern Metro Denver, Colorado from 2003 until my employment with the FBI in 2013. While employed with the Sheriff's Office I was assigned to the Denver DEA as a Task Force Officer for five years, where I conducted investigations into numerous drug trafficking organizations operating in the Denver Metro area.  I have received extensive specialized training, and developed experience in various criminal investigations. I have also received training pertaining to the exploitation of the internet and other communication devices. I have been the lead investigator or co case agent on several State and/or Federal Court authorized electronic intercepts. I have led or assisted in the execution of numerous search warrants to search particular places or premises for evidence of crimes.

### PROBABLE CAUSE

2.      The FBI is investigating the kidnapping of VICTIM F[1] by MATTHEW MULLER, a violation of Title 18 of the United States Code, Section 1201 (kidnapping). In support of my application for a search warrant, this affidavit contains information that supports

---

[1] Throughout this affidavit, I use the term "Victim F" to describe the female kidnapping victim and "Victim M" to describe the male who was left behind at the residence.  This affidavit quotes a number of emails, but used the find-and-replace function to substitute those terms for the victims' names.

probable cause, and some information that might be viewed as detracting from probable cause.

As explained below, law enforcement actually made a public statement that this was not a

kidnapping. I am including this because omitting information that detracts from probable cause

could risk the suppression of any evidence seized pursuant to the search warrant for which I am

applying. The history of this case notwithstanding, I believe that in light of recently discovered

evidence, there is probable cause to believe that MATTHEW MULLER kidnapped VICTIM F

and there is evidence of that kidnapping at the locations described in Attachments A-1 and A-2,

such evidence described in Attachment B.

3.     On March 23, 2015, at approximately 1:53 p.m., VICTIM M called the Vallejo,

CA Police Department (VPD) reporting that between the early morning hours of 3:00 a.m. and

5:00 a.m., UNKNOWN SUBJECT(S) (hereinafter referred to as UNSUB or UNSUB(S)) had

broken into his residence located on Mare Island in Vallejo, California, drugged him and his

girlfriend VICTIM F by force, and took her with them against her will to an unknown location in

his (VICTIM M's) vehicle.

4.     At approximately 1:55 p.m., VPD officers arrived on scene, observed that there

were no vehicles parked in the driveway or in front of the residence, and contacted VICTIM M,

who appeared disoriented and advised the officers that he was drugged and his girlfriend was

kidnapped. Officers entered the residence with VICTIM M, which is a "neat and clean" two

story single family home in a residential neighborhood on Mare Island. As officers entered, they

were directed to the kitchen area, where they observed thin strips of red duct tape across the tile

at the entrance to the other adjoining rooms. When asked, VICTIM M told officers that he was

ordered by the UNSUBS not to leave the boundaries of the red tape. Officers observed a small

surveillance/security style camera taped to the ceiling in the family room where it looked as if it

2

had a motion sensor and was functioning. VICTIM M told officers that the UNSUBS had put that camera up and were watching him. Officers observed several "zip ties" on the coffee table that were connected to each other, which according to VICTIM M were used to tie him up. Next to the "zip ties" were a pair of swim goggles that the UNSUBS put on VICTIM M. When officers went upstairs they noticed a strong scented odor in the air and that the carpets had recently been vacuumed. In the master bedroom, officers observed that there was no bedding on the master bed other than the fitted sheet, and that the closet to the master bedroom was open.

     5.    During this time with officers and later during interviews with agents and detectives, VICTIM M volunteered his account of the incident. VICTIM M stated that the previous evening he and his girlfriend of seven (7) months VICTIM F, who he originally met as physical therapist colleagues at Kaiser Hospital in Vallejo, had some "beers and whiskey", and watched television prior to going to bed together in the master bedroom around 1:00 a.m. At approximately 3:00 a.m., he was awoken by a bright light shining in his eyes, an electrical noise similar to a "stun gun", and the voice of a "white male", (hereinafter referred to as UNSUB #1), calling to them by their names, telling them to lie face down on the bed, which they did. UNSUB #1 then told VICTIM F to tie VICTIM M's hands behind his back with "zip ties" and his feet together, and then told her to move to the master bedroom closet. VICTIM M was then assisted off the bed and told by UNSUB #1 to hop to the closet. During this time UNSUB(S) placed a pair of swim goggles over VICTIM M's eyes, which had tape over them so that VICTIM M could not see. Once in the closet, UNSUB(S) placed a pair of headphones over his ears, which broadcasted a prerecorded message giving VICTIM M instructions of what to do, advising him that he was going to be asked a series of questions, encouragement to remain calm, that he was going to be given a drug that VICTIM M described as approximately "¼ of a bottle of Diazepam

and Nyquil", and was told to lay down. The message advised that if VICTIM M refused, he would be given the drug intravenously. The message further related that if VICTIM M or another named female whom the recording assumed Victim F was, did not comply with any instructions the other would be hurt, first by electric shock, then by cutting their face. While in the closet, VICTIM M stated that his "vitals" were taken and that he felt the blood pressure cuff being taken on and off his arm. VICTIM F was then taken from closet and brought to the next bedroom over, which VICTIM M knew because he could hear noises coming from that room. Still in the closet, VICTIM M was asked if VICTIM F looked similar to the other named female. VICTIM M told UNSUB #1 that they both had long blond hair and that the other woman had moved out of the residence in September 2014. UNSUB #1 left at this time and returned advising VICTIM M that he knew he banked with WELLS FARGO, CHASE BANK, had an account with SLEEP TRAIN, and grew up in Penryn, CA. VICTIM M never saw any of the UNSUB(S) and only heard the voice of UNSUB #1. At one time during this incident, he overheard UNSUB #1 whisper to someone, but never saw that person. VICTIM M said that he was informed by the recording that the UNSUB(S) were a professional group there to collect financial debts, that they were going to take the other named female, that there would be cameras placed in his home to monitor him, and that he would be confined to his living room, kitchen, and bathroom, where he would await further instructions from them. VICTIM M was further informed by the recording

*a different person  Chis Ray*

that ~~████████~~ would be taken and that he (VICTIM M) would have to perform certain tasks, and to keep his phone line open. VICTIM M was also advised that he would have to provide the UNSUB(S) with $15,000 for the safe return of VICTIM F and if he did not comply she would be hurt, first by electric shock, then by cutting her face. VICTIM M was advised to call into work sick as he would need to cancel plans for the next 48 hours and to send a text message from

VICTIM F phone to call in sick for her as well. UNSUB #1 told VICTIM M that if all went well he could go on with his life. VICTIM M said that at times he could hear UNSUB #1 talking to VICTIM F, but could not hear exactly what was being said. VICTIM M was questioned by UNSUB #1 about his vehicle keys and about any tracking or navigation systems in the vehicle. He was told that UNSUB(S) would be taking his vehicle and would leave it somewhere on Mare Island. VICTIM M was advised to give up all of his WELLS FARGO checking account information, CHASE BANK credit card account information, login information for VICTIM M's COMCAST.NET and LIVE.COM email accounts, the password to his wifi router in the residence, and access to his laptop computer, which was later taken by the UNSUB(S). After hearing these recordings and having these conversations with UNSUB #1, VICTIM M was taken downstairs and placed on the couch where his ankles were bound with duct tape, clothes were brought down for him, and scissors were left on the counter to help him later cut himself free. At this time, VICTIM M was advised by UNSUB #1 that he was not to leave the area that was taped off by the red duct tape and that he was being watched by the camera. At one point during this time VICTIM M asked for a blanket advising that he was cold and UNSUB #1 told him that UNSUB #1 wouldn't know how cold it was because "they" were wearing wet suits. After falling asleep on the couch, VICTIM M awoke, cut himself free from the leg restraints after slipping off the "zip ties" that held his wrists, and noticed that VICTIM F, his laptop (ASUS), and his vehicle, a 2000 TOYOTA CAMRY bearing California registration 4GQA436 was missing. VICTIM M further observed that VICTIM F's vehicle, a silver 1999 HONDA CR-V bearing California registration 5ASF373, which was originally parked in front of his garage that housed his vehicle, was moved and parked across the street from his house. VICTIM M also noticed that both cell phones, his an APPLE IPHONE 4 bearing AT&T wireless cellular number 916-XXX-7398, and VICTIM F's APPLE IPHONE 4 bearing AT&T wireless cellular number 714-XXX-9659,

were left in the residence. Upon looking at his phone, VICTIM M noticed a new email message on his LIVE.COM account from his COMCAST.NET account demanding two payments of $8,500, one from his WELLS FARGO bank account and the other payment from his CHASE BANK credit card account. If asked about the withdrawals, he was to explain that the money was to purchase a ski boat. VICTIM M called CHASE BANK and was informed that he could get a $3,520 cash advance on his credit card. VICTIM M then attempted to call his brother, who is a federal law enforcement officer, but could not get a hold of him, so he called his brother's girlfriend. After this he tried his brother again and finally was able to talk to him. After explaining the incident to his brother, his brother advised him to call the police. VICTIM M then hung up the phone and called 911.

6.     VICTIM M cooperated with officers on scene and agreed to be transported to the VPD for further interviews by detectives. Once at VPD, VICTIM M consented to a blood test to determine what drug(s) he was given during the incident, and at 3:54 p.m., blood was taken from his arm and later sent to the California Department of Justice's Bureau of Forensic Sciences Laboratory for analysis where the results are still pending.

7.     At approximately 6:00 p.m., California Highway Patrol's Air Unit located a vehicle matching the descriptions of VICTIM M's vehicle parked in the Department of Veterans Affairs Mare Island Clinic's parking lot located at 201 Walnut Ave. Officers arrived on scene and located VICTIM M's vehicle, that was backed into a parking stall with the doors locked and the keys sitting atop of the left rear tire. There were strips of red duct tape located on the top of the vehicle that were approximately one foot in length and two feet apart. The vehicle was towed to the VPD indoor vehicle bay, were it will await search by crime scene technicians.

6

8.     During this time the Solano County Sheriffs Office's Office of Emergency
Management Search and Rescue was conducting an extensive search of Mare Island for VICTIM
F.

9.     At approximately 9:00 p.m., at the request of the VPD, the FEDERAL BUREAU
OF INVESTIGATION's (FBI) FAIRFIELD RESIDENT AGENCY was requested to respond
and assist VPD with their investigation.

10.     On March 24, 2015, at approximately 2:00 a.m., after VICTIM M was
interviewed at great length by VPD he consented to a polygraph examination that was
administered by the FBI. Prior to the polygraph examination, Special Agent (SA) Peter French
advised VICTIM M of his Miranda Rights, which he waived, and completed the exam with
unknown results. During SA French's follow-up interview with VICTIM M regarding his
preliminary results, which became accusatory at times, VICTIM M terminated the interview by
requesting to speak with an attorney. VICTIM M left.

11.     At approximately 12:24 p.m., the following email was sent from VICTIM M's
LIVE.COM email account to HENRY LEE's email, a journalist from the SAN FRANCISCO
CHRONICLE newspaper at HLEE@SFCHRONICLE.COM:

> From: Victim F <Victim M@live.com>
> Date: March 24, 2015 at 12:23:11 PM PDT
> To: <hlee@sfchronicle.com>
> Subject: Victim F
>                [sic]
>
> As stated, Ms. Lee will be returned safely tomorrow. We will send a link to her location
> after she has been dropped off. She will be in good health and safe while she waits.
> Any advance on us or our associates will create a dangerous situation for Victim F. Wait
> until she is recovered and then proceed how you will. We will be ready.
>
> http://dropcanvas.com/buofr

The above email contained the hyperlink of http://dropcanvas.com/buofr, which is a link to an audio file (that has been "stripped" of all identifying data) that depicts a female voice identifying herself as VICTIM F, describing how she is still alive because she knows of the German airliner that crashed in the French Alps, and that it was in fact her as her first concert she went to was BLINK 182. This audio file was later played for VICTIM M as well as VICTIM F's father, who each recognized the voice as VICTIM F. Email header analysis revealed that the email was sent using the Singapore-based anonymous email service anonymousemail.com. The aforementioned "From" line was entered by the sender.

12.    At approximately 8:00 p.m., FBI Crisis Negotiator SA Arvinder Ginda and VICTIM M with his attorney arrived to VPD where VICTIM M was met by SA Ginda and the affiant in an attempt to gain VICTIM M's cooperation with investigating the kidnapping of VICTIM F. VICTIM M consented to sending an email from his LIVE.COM email account to his COMCAST.COM account in an attempt to elicit communication from the UNSUB(S). The email consisted of VICTIM M stating that he is worried for VICTIM F's safety and wishes to bring this incident to an end. To this date there has been no response to this email from the UNSUB(S) that agents and detectives are aware of.

13.    At approximately 8:30 p.m., VICTIM M showed the affiant two missed calls on his cellular telephone that were missed since it had been in VPD's custody, which were from an "UNKNOWN NUMBER" that called on March 23, 2015, at approximately 8:31 p.m. and 8:33 p.m.. Pursuant to a California State search warrant, AT&T later provided agents with the call records for VICTIM M's cellular telephone, which revealed that the actual phone number that called VICTIM M at those aforementioned times was 707-567-7789.  Based on the exigent circumstances described above, AT&T volunteered the account information associated to that

cellular number, which disclosed that it was an active TRACFONE. Business records show that the TRACFONE was purchased on March 2, 2015, at approximately 5:39 p.m., at TARGET, (store number 330), register number 0112, located at 560 Contra Costa Boulevard, Pleasant Hill, CA 94523. Target later provided agents with captured video footage and still photographs of the individual who purchased the phone. The video depicts a light-skinned male, with dark hair, medium build, wearing a dark polo shirt, dark shorts, and dark shoes. The phone was activated on March 23, 2015, with an account number of 436050464409 and International Mobile Subscriber Identifier ("IMSI") 310410760585437. With this information, AT&T provided call records for the above TRACFONE, which revealed that the two phone calls plus an additional call to VICTIM M's cellular number that failed to connect, was calculated by AT&T to have been placed from South Lake Tahoe, California, more specifically, within 200 meters of Grid Coordinates 38.915361, -119.967021, which is the intersection of Hank Monk Avenue and Horace Greeley Avenue.

14. On March 25, 2015, at approximately 9:48 a.m., agents and detectives were advised by VICTIM F's father that VICTIM F had called him from his neighbor's house in Huntington Beach, California, and stated that she had just been dropped off near her mother's residence on Lake Street, not far away. Huntington Beach Police (HBPD) arrived on scene at the request of VPD where she talked to officers. VICTIM F stated that while at VICTIM M's residence in Vallejo she awoke to several UNSUBS holding guns with red lasers. The UNSUBS told VICTIM F and VICTIM M that this was a robbery and that they were going to be restrained. She was then told by UNSUBS to restrain VICTIM M with "zip-ties". VICTIM F and VICTIM M were then guided to the closet. VICTIM F looked down the entire time and did not see the UNSUB(S). They were told that they would not be harmed and that it was only financial. They

9

were given swim goggles to wear that she could not see through. They were also given headsets, which played a relaxing music with a pre-recorded calm sounding voice reading a message that told them that they would be asked questions and if their stories didn't match or they didn't cooperate that they would be punished with "electrical shock" or scratches to their face. They were told a medic would check on them, asked about medical issues and their blood pressure was taken. The UNSUB(S) soon discovered that VICTIM F was not the target and that something had gone wrong. The kidnappers informed VICTIM F they were looking for VICTIM M's ex-fiancé, the woman whose name was on the recording heard by VICTIM M. The UNSUB(S) told VICTIM F they do these "tasks" for a client where they target someone for money. They told her that she was not involved and that it had to mostly do with the other woman's family. The UNSUB(S) informed VICTIM F that she would have to come with them for 48 hours until VICTIM M did something for them. VICTIM F's belongings including her bag, backpack, and purse were collected by the UNSUB(S) and taken with them. VICTIM F's phone was left with VICTIM M along with her passcode for him to send a message to her work about being gone for a couple days. VICTIM F was told to drink a cocktail with a sedative and was "knocked out" before being transported in the trunk of VICTIM M's Camry. This lasted for an unknown amount of time before she was switched to the trunk of a different car. She was then taken out of the trunk where she felt the cool concrete floor of a garage. VICTIM F felt like she was brought to a quiet house and placed in a bedroom. The bedroom had a queen size bed, dresser, and the windows were barricaded. VICTIM F was told to wear the provided swim goggles each time she had contact with the UNSUB(S) or when they entered the room. VICTIM F was secured to the bed with a "zip-tie" and a bike lock. VICTIM F told officers there was one of the UNSUB(S) that was with her the whole time, (hereinafter referred to as UNSUB #2). She described him as a

white male with brownish red hair and no accent. She never knew his name or saw his or the other UNSUBS faces. The other three UNSUBS were referred to by UNSUB #2 as, "T, J and L". VICTIM F told officers that the UNSUBS sounded well organized and had "protocols" as if they had done this before. After a few days it was decided to transport VICTIM F to her home town of Huntington Beach away from VICTIM M and the "commotion of the authorities" in Vallejo. VICTIM F was driven to Huntington Beach by just the one kidnapper in the back seat of the vehicle and told to lie down. VICTIM F described the vehicle as a smaller white vehicle with a modified loud exhaust. VICTIM F was unsure how long she was in the vehicle because they gave her a sedative. She believed that they were stuck in "L.A. traffic" for a while. The vehicle stopped in the area of Beach Boulevard and Utica Street where UNSUB #2 got out of the vehicle and removed her bags. He then had VICTIM F exit the vehicle where he took off the swim goggles. VICTIM F told officers that her eyes were still closed because they also had put tape over her eyes, which she described as square pieces of sticky cardboard. VICTIM F was told to face away from UNSUB #2 and told that he was recording her so the she would not turn around as he drove away. Once VICTIM F heard the vehicle drive away she removed the tape from her eyes and walked to her mother, JANE VICTIM F's residence at 1842 Lake Street. VICTIM F told officers that nobody was home so she asked a gardener who was working in the yard next door if she could use his cell phone to call her father, which she did and left him a voicemail. She then left her bags on the patio and continued to her father's house. VICTIM F further told officers that she was well cared for, given food and water and was allowed to use the restroom frequently. The UNSUB allowed her to shower, change her clothes and brush her teeth. VICTIM F showed officers her shoes and a large water bottle, all of which were given to her by the UNSUBS. The UNSUBS told VICTIM F that the intention was never to harm or kill her and she

would be released after they achieved a financial goal. VICTIM F told officers that she was scared of what could happen to her if she spoke with police and what information she provided would become public. VICTIM F looked at a satellite view of the area of Beach Boulevard and Utica Street and identified the alley of 2020 Florida Street as the location she was dropped off. Officers arrived on scene to that location and attempted to locate the discarded tape that was used to blindfold VICTIM F or further evidence, which met with negative results. Officers advised that VICTIM F had a calm demeanor throughout their interview. Upon first contact by officers, they noticed that VICTIM F had "darker impression circles" around her eyes, consistent with wearing swim goggles. VICTIM F told officers that she did not need medical treatment and did not appear to have any injuries. She also denied that any type of sexual assault had occurred.

15.    At approximately 10:11 a.m., HBPD officers contacted a witness by his wireless cellular number, who was the individual who allowed VICTIM F to use his phone to call her father. The witness advised officers that VICTIM F, who he has never met before, asked to borrow his phone because she "needed to call someone to get picked up". The witness allowed VICTIM F to use his phone and observed her make two phone calls on his phone. The witness told officers that he did not pay close attention to VICTIM F while she was on the phone but recalled that she left an unknown message during one call. He further recalled her talking to an unknown person during the second call telling the person she, "just got dropped off at her mom's". When asked about VICTIM F, the witness recalled that she seemed, "normal." Officers asked if she seemed nervous, excited, or scared, and he stated, "no, she seemed completely normal." The witness voluntarily showed officers his phone log on his cellular telephone, which revealed that VICTIM F made one brief call to each of two numbers in the 714 area code.

16.    At approximately 10:51 a.m., FBI Sacramento Field Division agents coordinated efforts with the Los Angeles Field Division to have VICTIM F transported back to Vallejo via airplane, however once she was released by HBPD and was to meet with Los Angeles Field Division agents for her transport, she could not be located and did not make any attempts to contact any members of law enforcement even after numerous requests through family members by FBI and VPD.

17.    At approximately 9:27 p.m., the Vallejo Police Department's Public Information Officer Lieutenant Kenny Park made a statement to the press that the kidnapping was, in essence, not authentic. This statement, as well as the entire case, sparked national media attention as well as responsive press conferences by those representing VICTIM F and VICTIM M.  It was stated to the public that VICTIM M and VICTIM F were interviewed in length and questioned as possible suspects.

18.    On March 26, 2015, at approximately 8:15 a.m., FBI was notified by VPD detectives that VICTIM F was located and was on her way to their office for an interview.

19.    At approximately 12:04 p.m., VPD Det. Matt Mustard, SA David Sesma, and witnessed by your affiant, interviewed VICTIM F in the presence of her attorney at VPD where she confirmed her statements originally made to HBPD and elaborated on certain aspects. During her interview VICTIM F stated that during her captivity she was sexually assaulted twice by UNSUB #2. The first time the UNSUB #2 sexually assaulted VICTIM F occurred sometime on March 23, 2015 after UNSUB #2 advised VICTIM F that the individuals who oversee his role in this specific operation were "making him" sexually assault her due to not ensuring that Victim M's ex-fiance, the intended target, was present and to video it in order to use it against her as well as UNSUB #2 in case she reports the kidnapping to authorities. UNSUB #2 took off her

restraints and gave her pizza and wine, which she ate and drank. Using a condom, UNSUB #2 penetrated her vagina with his penis. A second sex assault occurred on March 24, 2015, when UNSUB #2 advised VICTIM F that his "boss" wants him to sexually assault her again since there was a problem with the recording and to seem more "realistic" to make it seem like they were actually boyfriend and girlfriend so that it could be used against UNSUB #2 since he was recently engaged. When asked when the "proof of life" audio file was captured, she stated during the evening on March 24, however, according to the metadata associated to that file, it was actually that morning and sent to HENRY LEE on March 24th at 12:24 p.m. During the interview VICTIM F also stated that UNSUB #2 told her that the UNSUBS had gained entry into VICTIM M's home in the past on five (5) separate occasions. The latest unlawful entry by the UNSUBS prior to the date she was taken was on March 22, 2015, when the UNSUB's had made it all the way to the top of the stairs to conduct the "operation", but then "aborted" it. UNSUB #2 told VICTIM F that she was to be brought to her home in Huntington Beach due to her not being of any further financial use to the UNSUBS.

20.     At approximately 4:00 p.m., VICTIM F underwent a Sexual Assault Response Team (SART) examination, which was conducted at Queen of the Valley Hospital in Napa, CA in the presence of a female special agent of the FBI, who has reported that VICTIM F did not have any physical evidence of non-consensual sex.

21.     At approximately 2:13 p.m., an email was sent to HENRY LEE at the SAN FRANCISCO CHRONICLE at HLEE@SFCHRONICLE from VICTIM FKIDNAPPING@HOTMAIL.COM, which seemed to be a response to the aforementioned Vallejo Police Department statements to the press:

> From: <Victim Fkidnapping@hotmail.com>
> Date: Thu, Mar 26, 2015 at 2:13 PM -0700

14

Subject: Victim F
To: <hlee@sfchronicle.com>

"Mr. Lee and Chronicle editors,

This is off the record / on background for the moment. There doesn't seem to be consensus on what those terms mean, but for the moment we want neither the source nor the information quoted publically. You and the Chronicle will have exclusivity if what we ask seems appropriate and you deem it sufficiently newsworthy.

I speak for the group that kidnapped Ms. Victim F. We transmitted certain information to you earlier. Most of that was made public, except I don't believe any article mentioned that the sound clip was delivered as a link to a site in which users can anonymously post media files.

We are a group of what I suppose you would call professional thieves, though we have not been doing it that long and don't identify ourselves as such. We are more than 2 and fewer than 8 in number. All but one of us hold at least bachelor degrees, including from your alma mater.

Some of us have a tech background and are very good at overcoming electronic antitheft measures, stealing late model cars and reconfiguring systems as necessary to make the vehicle saleable in a foreign market. We have been operating out of Mare Island for some time, due to an arrangement with another person / group able to load stolen vehicles from sections of the abandoned southern part of the island and send them overseas to be sold. We are probably not especially high volume as theft rings go, but we have moved a considerable number of vehicles through and off the island.

We set up our operation in part of an abandoned warehouse on the south part of the island and periodically used other buildings there. In light of recent events we have closed down operations (which had already drawn down before) and moved off the island. It is possible that search crews noticed some indicia of our presence. We had a light footprint and moved quickly, but some things, such as broken auto glass, are very difficult to clean up in a hurry. We know for certain that island custodians saw evidence of our presence before, as they noticed and replaced cut chains and fence links. They also discovered cars we had hidden at least once and we believe twice, and recovered one of those cars.

As part of our operations we had to have an organized presence in neighborhoods and paths into the island, so that private security and residents did not notice unusual activity. It happens that one of our most successful auto theft modalities was simply sneaking into homes of owners and taking their keys. Although we took cars almost exclusively from outside of Mare Island (only two were from the island), we did enter quite a few homes there, probably not a wise mice given that it was so close to the most important part of our operation. But we were there a lot, it was entertaining, and we could.

At some point we decided that although a auto theft payout was decent, we did not want to do that for our whole lives. Instead we wanted something with a high pay out that we only had to do once or a few times. We settled on K&R. The [redacted] operation was meant to be a test of methods that would be used later on a higher net worth target, in an environment that was familiar to us and somewhat controlled. There was also a link to someone we thought was resident there but turned out not to be.

The operation went terribly wrong. After making the jump from property crime to this, we feel deep remorse and horribly regret our slide into criminality. In particular, we are mortified of the impact it has had on Victim F. In what I suppose would be a case of reverse Stockholm syndrome, we (and particularly the one in charge of holding her during the operation) were very impressed with the strength she showed and who she was as we passed the time talking to her. We are criminals I suppose, but we have consciences and seeing the impact of our actions on someone deeply affected us and caused us to reconsider our lives.

To be honest, not every one of us felt that way immediately. What galvanized us was the travesty that is the police department's response to Ms. Victim F, who in addition to being kidnapped (and again this is off the record and not really ours to share), was previously the victim of several horrifying crimes, the details of which we will not share because they were told in confidence during a vulnerable moment while she was drugged.

Ms. Victim F was absolutely kidnapped. We did it. We will provide incontrovertible proof of that and the Chronicle will break it. We will not turn ourselves in nor reveal our identities. Even after we "come out" we don't think there will be any link allowing the police to identify us. But it is still risky and as things stand now we could apparently get away with anything. We would rather take the chance of revealing the truth than live in a world where someone like Victim F is victimized again. And again. We have no prior link to Ms. Victim F

and did not know who she was until the night of the operation. We believed the woman there was Andrea Roberts.

We will come forward with a statement and evidence in the form of photos taken inside various homes on Mare Island and property taken. Apparently nothing short of that will convince the police that any crime took place. Prior to the kidnapping we did not commit any violent crime/crime against person. Nor did we ever enter nor tamper with any household with minor children, nor anything with the school on the island, nor with businesses. (Except that we did hang out and once or twice sleep in the Blu Homes prefab model on the hill). Nor did we tamper with any of the defunct military equipment. Nor did we even actually use firearms in our operations. Ms. Victim F and Mr. Victim M each woke up with a red dot on their faces looking down what appeared to be an assault pistol with rail mounted illumination and laser sight. Actually it was an amateurishly spray painted water pistol with a laser pointer and flashlight duck taped on (photo of one actually used is attached) it looks much more serious in the dark.

The bottom line, inconceivable as it sounds given what we have done, is that we didn't really want to hurt anyone. We are young adults, fairly recent college graduates, and up until now this was a bit like a game or movie adventure. We fancied ourselves a sort of Ocean's Eleven, gentlemen criminals who only took stuff that was insured from people who could afford it. The horrifying reality of what we had become and what we were doing did not set in until being confronted directly with Victim F's suffering and humanity. We now feel like the pieces of shit we have become. And though we don't have the courage to turn ourselves in and spend the rest of our lives in prison, we will not stand by and see the life of a really good person ruined. We dropped Ms. Victim F off at her home in Huntington Beach because it was more or less equidistant to the bay area and because we were horrified at what we had done and wanted her to have family and close friends around to help her recover rather than spending hours getting debriefed by police.

If you are willing to break this story and publish our statement, we will allow it. This is not the Unabomber manifesto, we don't care in what form you publish it or if you except certain photos for whatever reason. We would have it prepared by 10am tomorrow and will get you some sort of draft tonight so you know what you will have. That's probably not ideal for print media, but it's what we can manage. A phone interview with one of us is possible, anonymized. We do expect reasonable measures to protect our anonymity, but also don't want to stake our freedom on a reporter's willingness to be held in contempt (that also doesn't seem

17

fair). Nobody wants to shield a criminal, but it's a lesser evil than allowing the travesty that is the police response to this kidnapping to continue.

The only other thing we ask in return is that you pass a message to Ms.Victim F for us. We do not know how to reliably reach her.  Tell her again that we are unspeakably sorry and ashamed for what happened, including the matter resulting from an argument within the team. . Tell her that all threat against her and her family are lifted and she is safe. Tell her we will come forward and try our best to correct the situation.

Again, whatever you do, please do not pass along confidential information about Ms. Victim F' past, including to her family.

To let us know that you gave reached Victim F, please ask her to tell you the email address(es) she was told by one of us that she could reach us at.

We will check this box approximately every hour. Thank you for your consideration."

Attached to this email was a photo, which was "stripped" of all identifying data, of a black spray painted water pistol with a flashlight and laser pen affixed to it with duct tape. Email header analysis revealed that the email was sent using the Singapore-based anonymous email service anonymousemail.com. The aforementioned "From" line was entered by the sender.

22.     On March 27, 2015 at 10:00 a.m., VICTIM F was interviewed at VPD by SA Sesma and Det. Jason Martinez to discuss further details regarding her earlier interview. SA Sesma advised that VICTIM F had inconsistencies with specific details to her earlier statements regarding the events surrounding her kidnapping and the sexual assault.  SA Sesma further advised VICTIM F that it is a crime to lie to a federal agent.

23..    On March 28, 2015, at approximately 4:39 p.m., the following email was sent to SAN FRANCISCO CHRONICLE Journalist HENRY LEE who forwarded it VPD detectives, further describing the UNSUBS background and criminal schemes:

18

**From:** Kidnappers [none@nowhere.com]
**Sent:** Saturday, March 28, 2015 4:39 PM
**To:** Lee, Henry
**Subject:** Victim F kidnapping

"We kidnapped Victim F and held her for ransom, after breaking into the home of Victim M. The kidnapping was not a hoax, and neither is this statement by us, the perpetrators.

We are deeply ashamed and regretful of our unforgiveable conduct. Nothing can ever make up for what was done. Mr. Victim M and especially Ms. Victim F suffered a life-threatening ordeal painful beyond what most people can imagine. We were therefore dismayed, further ashamed, and truly dumbfounded that when Mr. Victim M and Ms. Victim F sought help from the police, the police turned against the victims, accused them of fabrication, and told Mr. Victim M and Ms. Victim F they would be prosecuted and fined. It was also disturbing how many journalists cast the victims in a negative light. Reports never directly stated that Mr. Victim M and Ms. Victim F were attention-seeking whackos who made it all up. But they conveyed mostly the information that would lead readers and viewers to this conclusion. Like the police, certain journalists crucified the victims long before there was enough information to do so.

We do not wish to distract from the fact that our unspeakable conduct is at the root of Mr. Victim M's and Ms. Victim F' suffering. The details of the case are unusual, and include conflicting information and deliberate obfuscation. This was intended, in order to make the crime more likely to succeed and to cover our tracks in case it did not. Since the elaborate nature of the crime has led police to disbelieve it and prosecute the victims, we will now explain things from the beginning.

Why would we do this when the information could be used to catch us? We are human beings, albeit poor ones. We cannot stand to see two good people thrown under the bus by the police and media, when Ms. Victim F and Mr. Victim M should have received only support and sympathy. We are responsible for the victims' suffering and the least we can do is come forward to prove they are not lying. Over the course of the crime, we realized what we had become and developed deep remorse for the harm we inflicted. We are haunted by the grace and fortitude Ms. Victim F displayed throughout her ordeal, and by her expressions of concern for her family and patients even while she was tied up in the dark wondering whether she would live until the next day.

The contrast with our own lack of humanity could not be more stark. If we were better, stronger people, we would turn ourselves in and face the consequences. We do not want to be caught, and I for my part will die before I go to prison. But we all agree that we cannot allow the victims' suffering to be compounded. We would rather risk giving the police information that could lead them to catch us than live in a world where two fine people like Mr. Victim M and Ms. Victim F could suffer a horrible crime and then have their lives further ruined by the response to it.

Since the police have been so doubtful, we will describe the circumstances in detail and provide what corroboration we can. This is absolutely not meant to sensationalize the crime. All attention should be on the victims, their ordeal, and their recovery. We wish it were not necessary to give this account. Many local residents will be distressed to learn what was going on around Mare Island and that we may even have been in their homes. But we appear to have no choice given that nobody will believe what the victims have told them.

During the period when Ms. Victim F was missing, we did communicate with the police via an intermediary. We provided them with "proof of life" and what we thought was credible information and evidence that Ms. Victim F had been kidnapped and was being held safely. They apparently did not believe it. We apologize to the people who needlessly spent time searching for Ms. Victim F and for the resources wasted in the search. But we did reach out with proof of the kidnapping and could not have guessed that it would be discounted.

We will now provide a full account in hopes that it will not be dismissed. We stated earlier to a journalist that we would provide things like photos of the inside of people's homes and other similar corroboration. We thought better of this considering the effect it would have on the residents and the further violation of their privacy. Nor will we publish images of Ms. Victim F while she was being held. Those that existed have been destroyed. We will instead make our account and description as detailed and complete as reasonably possible, so that the police will have a story sufficiently cohesive to believe. The police should be able to individually corroborate certain facts with island residents, without us publishing numerous photos to serve that purpose. We will also look into ways to transmit certain corroborating images to police and/or the victims' attorneys with sufficient anonymity. We apologize for breaking off earlier dialogs concerning this matter. We discovered DNS leakage issues that even with multiple layers of anonymity could have revealed our location, and were simply too uneasy with being tracked

to continue two-way talks. We are fairly sophisticated but have to accept there could be experts working this case who have techniques and technology beyond anything we could guess.

We are three acquaintances, two of us college graduates, who followed a path we did not think would lead to such horrific crime. We began as occasional car thieves, progressed to an organized auto theft operation, diversified into burglary, and eventually settled on kidnapping-for-ransom as a means of making enough money to retire from criminality. The Mare Island kidnapping was a training mission to test means and methods that would be used on higher net worth targets. We essentially agree on everything that will follow. One of us has disappeared and is not responding to contacts, but agreed beforehand that we needed to come forward with this even if we risked being caught. He was, in fact, the one who brought us around.

Two additional people were somewhat involved in the earlier parts relating only to theft. They had no part in the kidnapping plan. We did have contacts on Mare Island. They had no part in anything, knew nothing of what was going on, and like others in our lives would never have suspected what we were doing. Most importantly, before the kidnapping we had no contact with nor knowledge of Victim F, and only indirect knowledge of Victim M. There is simply no way they know anything about us. And they most certainly did not participate in planning a staged kidnapping. We think that idea should have been preposterous on its face given what information and evidence would have been available to someone investigating the crime. But it was an elaborate plan and probably unlike anything of which police had previously heard.

To protect innocent people we will not describe exactly how Mare Island became known to us or the circumstances of our first visits. At some point before starting up there, we had become involved in auto theft. We cannot say that we turned to a life of crime for lack of employment or other opportunities. We had jobs, not great ones and we were barely getting by given SF bay area prices. But we could have lived honest lives. There is no excuse.

It happened that one of us has a colorful family background. A relative who was involved in auto theft asked if we could do some things for him. We were all car enthusiasts, and he needed people with certain electronics/programming/engineering skills. We knew it was not on the up and up, but could not resist the challenge and the money we were offered. So two of us proceeded.

21

The relative essentially taught us the ropes, the players, and the different models for profiting from auto theft. Besides working on cars, we ended up out in the field, acquiring them. We learned how to use reach tools, drill out locks, break windows when needed, and a host of other things. It was exhilarating and such a contrast to the office doldrums. He'd treat us after a good take. It became a game, one in which nobody was hurt because we only stole higher end vehicles that certainly had theft coverage. The relative talked about having his own car stolen once, and how great it was to get the payout from the insurance company because he could get something new and different if he wanted. We never did any car jacking. We didn't even leave people stranded at the supermarket. Cars were taken almost exclusively from homes, in various better-off neighborhoods of northern California. Nobody was getting harmed really, we figured. Maybe even the opposite.

Things progressed from there quickly. One of us quit his job for unrelated reasons and had more time to spend on theft endeavors. We developed and built electronics allowing us to exploit quite a few makes and models' keyless entry and start systems. In order not to provide an instruction manual to other would-be thieves, we will not spell out the details of this. But as we understand it these methods are fairly common knowledge in the field, and the exploits are primarily a challenge of execution--of navigating the quirks of the different systems and vagaries of using the devices in the field.

There was a night when we were trying to get a read on a key from outside to relay a challenge/response, with a vehicle we knew our devices should work on. It was sometimes really painstaking and quirky, not to mention problems like the vehicle dying on you or refusing to restart or the alarm going off. As we kept walking the antenna around to get the signal right, one of us said something like "just go in and get the f***ing key, they're asleep upstairs, it's right there on the counter." That would also mean we didn't have to spend the time to clone or reprogram keys. So that's what we did. And from that point we realized it was easier to just get inside someone's home and take a key. We had equipment that made finding RFIDs easy. Sometimes if we didn't want to take the key and reveal we had been in the house, we cloned one on the spot, or swapped out key handles (even a vehicle forensicist couldn't tell it was the wrong RFID in most cases, you'd need to know what was programed in the car's ECU). We had vehicle diagnostic equipment (the operation was associated with a legitimate shop) that could program new keys into the ECUs or do a factory key reset. Some cars you

could even do this on manually, though usually you needed both original keys for this.

Things were going well. Eventually the third of us joined back up. He brought in two other people, one with relevant prior experience and contacts. We were then in the midst of discussions about how we could capture a greater amount of the profit on stolen cars. The share of the rank and file thief was actually not that large, even when delivering a car with keys and a new VIN plate. It was further up the hierarchy that the real money was made. So we explored different models. We looked into things like getting a dealer's license, or a rebuilder's license, so that we could purchase salvage cars, maybe part them out and use their VINs to resell stolen autos. We studied salvage laws in different states, to see if there were differences we could exploit to make VIN swapping cheaper and/or easier. We dabbled in the parts market and even sold quite a bit of stuff online (through false identities).

But it was all actually hard work and a lot of risk for not all that much money. We figured that if we really wanted to profit, we needed a deal with someone who could get the cars to an overseas market. We knew the mechanics of how to do this and could make the car appear legitimate for international shipping. But there was no way we could manage the full network, smuggling, sales and so forth. It was just too ambitious for a small an inexperienced group.

So some introductions were made to us, and we were checked out. By then we had already discovered Mare Island and were making use of some abandoned buildings occassionally. The north part of the island was well patrolled, probably because it was adjacent to Vallejo, but the south was practically empty except for turkeys and coyotes. We set up a sort of home away from home and spent more time there, never seeing signs of anyone other than the caretaker and the very occasional jogger.

The area had amazing logistical possibilities. So we made some proposals, learned how some different things worked, what was possible and what was not. And eventually we reached agreement with an outside group. We will not here, nor will we ever, disclose information about the group (and we know little), nor about the nature or timing of operations, nor anything that places that group in any sort of risk from authorities. Our missing member absolutely is not cooperating with authorities and in any event knew the least. We will say that this pertained to cars only, nothing else was smuggled nor even proposed to be

smuggled.  We took straight payout for deliverables and had no stake nor knowledge of where they went.

As stated we smuggled cars onto Mare Island and processed them in its abandoned southern portion.  There were various things that needed to happen before the cars were brought to a final staging point.  We stole license plates in order to aid transport of stolen vehicles.  We typically found a similar car to the one stolen (or to be stolen) and took its front license plate, then swapped in a front license plate from some other nearby car (ideally with the first letter/number the same) to reduce the possibility that the owner would discover the missing front plate and report it.  In any event, it would give us enough time to transport the vehicle without getting pulled over, even if the original vehicle was immediately reported stolen.  We printed our own registration and month stickers and used the stolen plate as a back plate.

Before taking a car to the final staging area, we would do some prep work at another location.  There were quite a few of these and we did not concentrate too many cars in one area.  At one point we were leaving the vehicles at these locations a while (with the new plates), so that if a car had LoJack there would be time for it to be activated and the car recovered.  Obviously we did not want the cars recovered at one of our staging areas.  Later we learned how to reliably check for LoJack installation.  Other initial work might have included removing anything distinctive about the car (bumper stickers or personalized plate covers), taking pictures, etc.

We sometimes fulfilled requests for specific cars but in no way solicited those sales or interacted with endpoint buyers of any sort (individuals, criminal organizations, etc.)  We searched out particular cars using craigslist and other online services, and a combination of social hacking and pinpointing locations using Google maps satellite and street views.  As described below, we used internet connections of island residents for many of these activities, and usually with an additional anonymizing technique (anonymous proxy, TOR network, etc.)

Just to offer a few corroborating anecdotes that do not put our contacts at risk and would be things known the the Vallejo police: We generally did not take cars from the island (don't sh*t where you eat, as our "mentor" put it).  However, we did take two that we'd seen around the island.  The first was a slightly custom SUV that was well-matched to an outstanding order.  It was parked in front of its owner's house and we located a proximity key in the garage.  We did not want to drive it off the island because we assumed they'd check the cameras (which we

had tampered with at various points but I think were probably working then). But it was also a prime candidate for LoJack and we could not just take it out to one of our usual staging areas. So we decided to hide it in the Mare Island preserve for its waiting period. We put it in what must have been the admiral's old residence overlooking the channel. A sufficient period went by and we retrieved the car. However, we'd closed it into a garage and set up several tamper-evident features. Some of those had been tripped, so it had obviously been discovered. We worried that if the police recovered the car there, they would start taking a harder look at other parts of the island. So that night we removed the car, drove it around to the other side of the island, and parked it behind a warehouse with intentions to move it off the island the next day.

But we got worried. In our rush we had made a mess of moving the car, cutting through fences and doing other things we realized would just draw more suspicion. We had codes for most combination locks on the island (not an inside job, the codes for most locks were the same and we acquired it by surveillance and planting a hidden camera). But we needed to take some routes that didn't allow us to use them. We also realized that the car seemed to have been discovered several days previously, and thought it odd that it had not been recovered. We knew of several theft rings busted by tracking devices, so we figured that police might have planted one and were waiting to see where it was transported. Nobody wanted to drive the thing and it certainly wasn't going to our partners. So we just left it to see what would happen, and suspended operations in the meantime.

After a few weeks, we actually reported the car ourselves. We figured that if it had become a bait car, the police would still leave it and we would know for sure. It took a while after that, but it was recovered. And we saw it back in the neighborhood. So it seemed everything was fine and we resumed operations.

Another thing of which the Vallejo PD may be aware. Sometime around November, we (stupidly) decided to drag race a couple of the cars at night in the abandoned portion of the island. We didn't realize how loud it was and think somebody called it in, because the next day the custodian was there taking a hard look around, and seemed to park and watch more than usual for the next few days. We want to mention that this guy was not a bad caretaker. When we had to do something like cut a fence or chain, we were surprised out how quickly he found and mended it. There were plenty of other places on the island where teenagers and vagrants were trespassing and skateboarding or drinking beer or what have you. We even set up some beer bottles and trash once when we knew

he'd seen evidence of entry, so that he'd just think it was some random folks partying. It did not look like port of Oakland out there, operations were in fits and spurts, by no means continuous, with long periods of inactivity. And we were careful. During periods of inactivity there would not have been evidence of our presence. Even things like our solar panels we would break down and put away if not there for a while, despite their not being visible from the ground. We would choose one place to store various things that were a pain to move. But with all of the warehouses, bunkers, nooks and crannies this place had, there's just no way to easily locate that sort of cache.

We had ip video surveillance, game cameras, a full electronic perimeter, you name it. Even a drone. A multi-thousand dollar custom drone, not a kid's toy. We got good at using it on the island (if you can fly a drone in that wind, you can fly it anywhere), and there was some industrial/manufacturing activity in the eastern portion of the island at night that masked the drone's sound. We flew it mostly at night and/or too high up to see easily from the ground. Maybe some residents still noticed it. Vallejo police, if you were wondering what those two red vinyl stripes were on top of Mr. Victim M's Camry, they were to help the drone track him later in the operation. For what it's worth, drones scare us too. They are not at all complicated or inaccessible for someone with decent technical skills, nor that expensive. Ours had a FLIR camera, built up from a consumer model. We used it to check things like heat signatures from above, and later to figure out how to hide from a police helicopter in a hypothetical manhunt.

Speaking of heat signatures, grow house, we know who you are. It's actually the distinctive color of those new LED lights that give it away more than emissions. Work on those blackout shades. Though it seems like you've drawn down recently.

As a corroborative example that involves the drone at least indirectly: we were testing a new zoomable camera, gimbal, electronic image stabilization software and high quality video uplink one night, as well as some sensor/telemetry items that helped the drone hold position better. The drone was hovering about 20 feet outside the second story window of a student house near the end of Sundance (which we'd cased previously for the BMW there, we had even created a key for it and for another car usually parked out front, since it was close to our base of operations and we might need a different car in an emergency).

We had a good steady shot inside, even with zoom. And we saw that the upstairs resident was apparently dealing, because he was going through an envelope full of

bills with some markings on it, and had some other paraphanelia. We were nearby and decided to come over and have a little bit of fun. We agreed that whoever could go up and snatch the drug money with people still in the house would get what's in the envelope plus the other two people would have to match it. One of us was up for the challenge. He climbed in the window and zipped up the stairs while there were about 5 people chatting in the next room, got the envelope, and slipped back out the window. The guy was definitely dealing, seeing the markings up close, but business was slow perhaps because what had looked like a fat envelope was almost completely ones. So to that gentleman, we're sorry we stole your drug money. And we're more sorry toward the other people in the house you probably blamed for it.

Our irreverent treatment of very serious material is at least somewhat intended as emblematic of how our attitudes had evolved by this point. It is no laughing matter. We committed a home invasion on a whim. It had become so common for us to break into people's houses that we joked about it, still not really seeing the harm besides creating a little mischief. It was like something out of A Clockwork Orange, up to that point without the ultra-violence.

We entered many homes on Mare Island. I will start by saying which we did not enter. If you had minor children living with you, we were not in your home. It is hard to gauge age sometimes, but if your son and/or daughter appear to be under 18 then this should be an accurate statement. If we saw toys and such in the yard we didn't even come close. If you have a medium to large dog, we did not go in your home (unless perhaps it was away from the property during a vacation). If you appear to be 55 or older, we did not go in your home. If it was apparent that you are a veteran, retired military or have some other military connection, we did not go in your home. If we saw your house at night and the exterior was dark, and then we looked at it through our night vision and it was lit up like day with IR illuminators, we did not go in your home. In one case that also spared your neighbors. If you appeared to be especially vigilant, like the guy around the 300 block of Crisp who had his backyard staked out with lights and camcorders, we did not enter your home.

For others, we may have been in your homes, and we are deeply sorry for and ashamed of the violation, which at the time felt like nothing to us. We did not steal things in most cases. And in all but two cases (one mentioned above) we were not there when you were there. We had need of internet connections for various reasons, so we typically took down your network information. At some point we were more invasive and began going through people's belongings to

learn about them, especially their electronic files. We were considering identity theft or the like, but decided that it did not have the right ratio of profitability to relative harm. So it ended up being largely for entertainment, like a reality TV show, only not staged and completely fake.

We mention these violations in part because we have to, to avoid further harm. In the run-up to the kidnapping, we planned various false leads and evidentiary obfuscation. This included collecting hairs and a few items that might have fingerprints on them from certain Mare Island homes. It's true you can get random human hairs from all sorts of places, but we wanted something that would seem to create actual leads and not just noise. We also used equipment from certain homes, or spoofed MAC addresses and/or IP addresses from equipment we did not disturb. So police, if you think you have a strong lead, we are telling you that the perpetrator is not on Mare Island, and if you storm a house and hold someone at gunpoint, it is going to be an innocent person. Exhaust the leads as protocol requires, but don't come in shooting. And yes, we acknowledge that it would be on us more than you. We also acknowledge that it's not impossible we would have shed DNA during the operation, though we took countermeasures including full body wetsuits (also for purposes of a swimming escape if the island were sealed off), exfoliating, moisturizing, hairnets and balaclavas. We attempted to plan not just for forensic techniques that exist now, but for techniques that could be used on preserved evidence years from now. That could include taking a vacuum bag full of dust (mostly skin) sucked up during the investigation and preserved, and in a few decades isolating, amplifying and sequencing every last bit of DNA in there, and then comparing it to a mandatory government universal DNA database.. And with some machine intelligence as smart as 100 investigators, connected to massive historical data resources and working the matter around the clock, it would not be sufficient to simply introduce random DNA noise.

In any event, none of us has a conviction requiring fingerprints, DNA, etc. and we won't be in the system, nor do our relatives to our knowledge have convictions that would require collecting their DNA. We understand that protocol doesn't allow you to believe these statements. But we are obligated to say something at least to avoid wasted resources and more importantly to make sure an innocent person is not harmed by our obfuscation.

I will pause to note how fantastical all of this sounds. Because even I can't help but help but think that as I write. But it is not that implausible. Usually the people plotting hard core crimes, the people tinkering in their garages with

arduino boards, the people trying to think of a good start-up, the people following futurists like Ray Kurzweil or Bill Joy and who had way too many pot-fueled college debates about how exactly machines will take over the world... usually these are not the same people. In this case they are. But whether it sounds implausible or not, this is what happened.

Returning to auto theft and incidents of which the Vallejo PD is aware: another car we acquired on island was a white mustang convertible. This was from a med student, who also had two fake Armani leather jackets in his closet (we couldn't figure out whether he'd bought them or was trying to unload them, we also don't remember whether we ended up taking them or not). We didn't enter the house for the car, we actually just wanted the wireless passwords and to see what else was there. This was a reported break-in, so we will try to give a few more corroborative details. We did copy/clone hard drives in this house and looked around quite a bit. We did not really scrutinize the downstairs resident. The two front upstairs residents seemed like really good people. How would someone judge you if they went through your room and hard drive? These two were squeaky clean. No evidence of cheating on significant others (that was common), no hidden camera sex videos in which it was obvious the woman didn't know she was being filmed (saw those), and no other such shenanigans. Just good straightforward people who seemed to be the exception to the rule, and who made us feel bad for ever looking.

As for the midwestern med student in the master bedroom, you can never tell for sure, but it seemed like he might be a bit of a punk or just somewhat full of himself. He certainly went tear-assing around the island in that Mustang of his. So we took it, and maybe saved a neighborhood kid or dog. No really, it wasn't a car we could really use and we would have left it if we'd thought more of him. Sorry if we got it wrong, you could actually be a great guy. He at least seemed to be a contrast to the Asian med student living in a front bedroom of the house across from them, who also kept a set of car keys in his desk, but whose Toyota we didn't even think of taking because it looked like he had or was going to enlist in the military.

By the way, at least one person, a worker from the golf course, saw the Mustang and a few more cars staged in the southern portion of the island a few months back. The mustang had red stripes painted on by then and some other details changed. We don't know whether this was reported.

A few more corroborative points: there were I believe only two houses from which we took very much and that were reported. It was a random selection of things because we were mostly outfitting our operations base. So yes, the AppleTV and Keurig 2.0, but no not the PS3 (had one). Aside from that we only took things we might want for a mission. We always staged some point of entry, chose a window and made it looked like it might have been forced, but we never had any problem getting in and out without any trace. We tested alarm systems and response times and figured out workarounds. For obvious reasons we wanted to see how fast the police could get out there.

Other break-ins and car thefts we had nothing to do with. We did not want extra police attention on the island. We also generally did not go peeking into houses when people were there, except in a few specific cases in which we needed to correlate people with cars so we could tell from a lookout or video feed if someone was coming home. As for nudity and the like, we won't say we never saw anything (close your blinds people, even if you're facing a swamp) but we weren't there for that purpose. There was definitely a peeping tom in the neighborhood, presumably a student, and he seemed to cause a commotion a few times. We scared him off a roof one night, and even called the police on him once (from a burner phone, pretending to be a resident). We did not need a pervert making people more watchful and increasing the police presence on the island.

Hopefully the above will be sufficient corroboration for the police to see the reality, and will also provide some context for what comes next. We did not want to stay thieves or criminals forever. What we really wanted was to complete one or two big jobs and then to do whatever we felt like for the rest of our lives. There were various complications in the auto theft operations and we were getting weary of it. Perhaps the novelty was wearing off and it felt more like drudgery. The final straw came when we were getting ready to move a batch one day, and what seemed like a swarm of helicopters descended on the island and started making low level flights all over the place. We thought for sure we had been discovered and hastily packed up and hid what we could. It turned out they were spraying for mosquitos. The two more peripheral people quit at this point. It had just become too stressful. Two those two individuals: we have not sought to contact you, for your own safety. We are very sorry, do what you like and we certainly will not carry out any threats made. You were obviously right.

After that we packed up our operations and moved almost everything entirely off the island instead of just mothballing. The three of us remaining continued

planning for what we had discussed before. And that was a kidnapping for ransom plot. This seemed to be a common crime in other parts of the world. It seemed in the United States it was uncommon primarily because of the difficulty of executing an exchange without potentially being apprehended by authorities, and by the difficulty of spending the ransom undetected. We figured that these were just logistical problems that could be overcome by technology and perhaps by psychological means.

We developed an elaborate plan that ultimately was to be used against high net worth targets. We would choose a couple, take them into custody in the middle of the night, and ask them detailed questions about every aspect of their lives. There was a questionnaire written up for this purpose. It included financial information, work history, friends, family, email accounts, passwords. Everything we could think of. We would separate the couple and use them as a check against each other, to make sure one was not lying to us. We would also know the answer to certain questions from our prior research, and drop in some information to the discussions to warn the target that we already knew much of what we were asking and remind them that their partner would be punished if they lied. We also would administer various drugs stolen (sometimes just a few pills, to escape notice) from other homes we had been in, to keep the victims calm and compliant.

If we had not already, we would then assess the target's financial situation and what they could afford to pay for ransom without completely knocking their lives off track. One matter we were figuring out was in what form we would collect the ransom, given that anybody walking into a bank and requesting $100,000 cash is going to draw some attention. We chose $8,500 because it was below the $10,000 reporting threshhold, and far enough below that it likely would not be flagged as part of a structured transaction under that prong of the reporting law. As part of our test run, we wanted to see in what form the money would be received. Specifically, was there any way to discern whether the bank had included alert bills in the lot? We had studied quite a few different money tracing techniques and needed some real world data.

The cash portion of the ransom was not going to be the only thing demanded. We researched money laundering and value stores such as gold and diamonds. Diamonds were especially attractive, given that we wanted to use the drone during the drop/pick-up phase of the operation and stay at a distance. Diamonds were more than small enough to make this possible. We researched and succeeded in polishing the laboratory certification number off the girdle of a sample diamond. We investigated diamond "fingerprints" and what cut and characteristics would give us an untraceable value store, and how much we would

lose in resale. We researched gold coins and bullion, and decided that Canadian gold maple leafs would be our best option. However, for the Mare Island operation, we would use one or more diamonds, given the shorter period of captivity that would require (gold coins take longer to arrive).

So one captured subject would be responsible for obtaining the ransom and the other would be used as collateral. Typically the female would be collateral, due to the manageability and gender dynamics. The male, although not technically captive, would be watched 100% of the time during the operation by video surveillance set up in the couple's house. He would be restricted to certain areas of the house. He would also be responsible for deflecting attention from the fact that his partner was missing. He would call in sick for her, reply to texts on her behalf and/or pretending to be her, and in general field any inquiries that might arise. All of his communications would be monitored. His phone would be tracked. Any computer or device he used would have installed on it monitoring software such as Spector 360.

Essentially, we would have complete control and there would be no way for him to contact authorities without us knowing. No surprises. We even had planned to call pretending to be a concerned neighbor and offering an apparent chance to alert the outside world surreptitiously ("if you're being watched or something right now and can't speak freely, just say 'thank you, I'm really ok' and I'll know what's going on"), and then punishing him for it to make sure he would be uncertain about any real such opportunities that presented themselves.

While collecting the ransom, the subject would also be monitored 100% of the time. He would have to have an open phone line, his phone would be GPS tracked, there would be a back-up tracker on the car, and both of them would be monitored by a drone as much as possible (given flight time limitations). Certain ransom items, such as diamonds, would be delivered to the house, and the male would be there to collect them. Their credit cards would also be used to acquire certain items that were harder to get anonymously.

The kidnapped subject was to be treated well and comforted as much as possible under the circumstances. Upon her return, the couple would be informed of the dire consequences of any attempt to contact the authorities. At various stages, we were to let slip or insinuate that we were ex-military and/or long-time members of organized crime and of a K&R ring in particular. This K&R ring was supposedly responsible for collecting on debts and promises owed to organized crime. The subjects would be told they were targeted because a family member had failed to

live up to a promise. We practiced some military jargon and in general tried to come off as militaristic and professional in our execution of the mission. Basically, we wanted to be seen as hard men who would treat them professionally but not hesitate to harm or kill if required. Stating that we were a standing ring would also allow us to normalize certain desired conduct, such as not reporting the ordeal to the police afterwards. We would mention how and why other victims had not reported, and what had happened to those who did. And besides direct threats made against family members--whose detailed information we would have collected--there was the uncertainty of an unknown family member or associate being involved somehow, and what effect reporting to the authorities might have on the family.

We rehearsed various aspects of the kidnapping extensively. We did not know how people would react to being woken up and taken prisoner. We did not know whether to subdue them by force or by threat. We knew we did not want to use actual firearms. We did not know whether people would be able to even function under such stress. We came up with a number of measures to address these issues.

First, we considered subduing people with stun guns. While they slept, we could easily close with them and administer a safe but sufficiently long shock to incapacitate them. They could then be bound and moved without a great deal of commotion or a dangerous struggle. We actually simulated this. It turned out that even well-reviewed stun guns are consistently effective only as pain-compliance tools. Even a full five second shock to one of us did not fully incapacitate or disorient us, though it was extraordinarily unpleasant. We did not want to use tasers due to associated fatalities. So we used stun guns only for intimidation, and potentially would deliver a brief shock to the male if circumstances called for punishment.

Those were not the only nonlethals with which we experimented. We also purchased a dog-bark collar, to find out what, if any, human yelling or noise could activate it. We tested a regular remote control shock collar. And we tested a muscle stimulation device taken from a Mare Island home, to see if we could arrange the electrodes in a way that would involuntarily close off someone's throat if he or she tried to scream. We tried all of these items on each other, jack-ass style, but elected not to use anything except the stun gun for intimidation. Items were bought with cash or anonymous gift cards, or stolen. One or two things were purchased with a stolen credit card.

33

Instead of subduing by force, we subdued Mr. Victim M and Ms. Victim F by threat. Mr. Victim M was more fastidious than most homeowners about securing his house. We had to drill through a window pane to release a lock. (If the CSI time inspected the site closely, they probably noticed the drilling. The apparently jimmied garage window was staged.) We made our preparations and inspected a few last things once inside. We found a purse with ID belonging to a Victim F inside. This was unexpected. The operation had been planned around Victim M and another person we believed present, initials AR (authorities will be familiar with this person). We will not discuss why or whether it was significant that it was [Victim M's ex-fiance]. There was some connection, and somebody on the team had been shown a picture of [Victim M's ex-fiance]. Certain features were the same as Ms. Victim F' so we assumed it was the same person. There had also been belongings and engagement cards in the house suggesting that [Victim M's ex-fiance] was still living there and was Mr. Victim M's fiance. However, we had previously entered the house some time before and this information was stale.

Two of us went upstairs and woke up Mr. Victim M and Ms. Victim F while the third served as lookout. We used fake guns with strobe flashlights and laser pointers attached. They woke up and complied with our demands to cooperate and accept being bound. They were obviously scared, but much calmer and collected than we ever would have expected. They were moved into the closet.

At that point, I went downstairs to see to various things that needed to be done. I was not the one dealing directly with the subjects and the person who did is unavailable. I am pulling some of this information and text from an e-mail message that person wrote. But I may get certain details wrong. That is most certainly not because this is a hoax. Everything Ms. Victim F and Mr. Victim M tells you is undoubtedly true, however bizarre it might sound.

The subjects were given headsets to listen to calming music and some spoken instructions. Their vitals were checked and a brief medical history obtained. We wished to administer sedatives both to make them more compliant and to make the situation less traumatic for them. We had extensively researched drug interactions and had various options depending on what seemed safest for them.

For whatever it is worth, I will say briefly that throughout the planning process, it was our currently missing member who insisted on various safety measures and on minimizing harm, as paradoxical as that sounds. He spent a great deal of time trying to make a horrific crime easier on the victims. He even delved into literature on trauma and recovery, having gone through something like it himself,

and had prepared materials to be given to the victims afterwards. He obviously chose to take part in this and is just as culpable as any of us. But I felt it needed to be said.

At some point, that member of the team informed me that the person we had was Victim F and not [Victim M's ex-fiance]. This threw a monkey wrench into our plans. Disagreement broke out among the three of us. I insisted that we should continue and carry out the operation, that it was a training mission anyhow, and that we needed the experience so that we could have successful missions later. So we continued.

As planned, one of us collected detailed biographical information about the subjects. Another of us began going through computers and phones and compiling information. The third began setting up technical items such as the cameras and tracking software that would be used to control the subject responsible for obtaining ransom.

The team member handling the subjects wanted certain information conveyed: throughout their ordeal they remained calm, if scared. They expressed concern about each other. When told they would be missing work for several days, they asked about their patients and how they could make arrangments for them and whether they were allowed to write a message. In many ways, there were more composed than we were.

The operation continued to go awry. Mr. Victim M could not remember the administrative password for his router, and the spare that we had brought was accidentallybroken in one of the packs, along with a camera. The reset button on the Asus router did not seem to work. The monitoring software we had did not seem to be compatible with the iOS version of the subjects' iPhones. We would essentially be flying blind, with most of our planned monitoring measures unavailable. Further, various points of leverage against the subject had been lost given that the female turned out not to be [Victim M's ex-fiance].

We proceeded nonetheless. Mr. Victim M was given instructions to remain bound until a certain time, and then to wait for us to get in touch. Ms. Victim F was evacuated in the trunk of Mr. Victim M's car, which was switched out for another car that folded into the regular morning traffic on the island. That car was then swapped out for another that brought Ms. Victim F to her final destination a few hours away.

We cleaned up, ran through our checklist, distributed our various red herrings, and cleared out. Not long after that, the team member responsible for technical matters such as the ip cameras stopped cooperating with me. He also had the computer on which much of the information we had collected was stored. I had very limited means of even getting in touch with Mr. Victim M, and was uneasy about doing so since I was less familiar with all of the ways communications could be tracked.

Ms. Victim F was treated as planned and was calm and stable according to the reports of her handler. This team member, in fact, was apparently so impressed with Ms. Victim F' bearing that he became her advocate. There could be no clearer case of reverse Stockholm syndrome. He urged me to end the operation and drop the ransom request and give everything up. Having two team members betray me enraged me at the time, and worried me deeply. I felt that the team member handling Ms. Victim F was going to give up and go to authorities. I took strong measures to prevent that, made various threats, partially carried out some, and I am deeply remorseful for that, wherever you are.
That team member wanted the following conveyed (lightly edited): The very first time I heard her cry was not until the last few hours. I showed her an article on her kidnapping, and it included a plea from her father and reflected how worried her family was. She began crying as she read, and I said something like "I know, seeing it in print must make it feel like this is really happening to you." She said something to the effect of "no, it's not that, it's just that I can't imagine how much my family is suffering right now." She was bound, drugged and didn't know for sure if she'd see the sun again. And she was worried about her family. Before she knew that Victim M went to police and this was news, she also kept asking what time we thought she would be returned on Wednesday, and whether she would get to work on time. She wanted to know what her boss and patients had been told. For god's sake this has to end.

I believe the rest of what happened is known. I will not go back over the persecution of the victims. There are doubtless good, hard-working men and women in the VPD and press corps, certainly better people than we are, and though they may have some soul-searching to do perhaps they should not be exorciated for this. We are the ones responsible for this insanity. And I do not like to admit it, but in all likelihood it would have continued if things had gone differently that night, and if Victim M and especially Victim F had been less uncommonly good people. By the strength of her character, Ms. Victim F more or less single-handedly broke up a professional K&R ring before it got off the ground. We are not casting her as a saint to try to make things up to her. I'm sure

she is as human as the rest of us. But it is the simple truth that she has prevented a great deal of harm to others, and suffered a high cost herself.

We obviously have not been good Christians. But for my part, I believe God placed Ms. Victim F in our path to prevent us from inflicting even greater harms on the world. And He further tested her with the police and media response in order to root out our last shreds of humanity, to humble and shame us into forever abandoning our horrific plans, and to confess the truth of what happened and what we did. I do not know whether Ms. Victim F even believes in God, but whatever religion she may or may not hold He has undoubtedly worked through her.

This is the only statement that will be made. We are not doing an interview or AMA or anything else that might seem to sensationalize this. I apologize for passages of this that were light or irreverent. It was written piecemeal over multiple days, by multiple people, and has turned out a bit incoherent and stream-of-consciousness. But I believe it contains the necessary information. We have also included a few corroborative photographs, described below.

What we did was evil and shameful. Period. The only point of explaining is to make the police and the public believe the victims, so their nightmare can end and they can heal and get on with their lives. All indications are that Ms. Victim F and Mr. Victim M are two really great people who deserve none of this. We are obviously not the ones who can help them with their recovery. But we certainly hope the police and others will now see to it that they are supported unequivocally and fully.

Corroborating Photos
http://www.anony.ws/image/DOcI

The first photo includes the last of the gear to be disposed of from our operations. It is a tiny but representative fraction of what we had (the rest of which has been disposed of across the bay area and state). It includes, among other things, one of the fake guns with which the victims were threatened (some spray paint has rubbed off), cameras and microcameras, video transmission equipment, routers and computers, various electronics and repair supplies, gloves used the night of the operation, blood pressure cuff used, zip tie bindings worn then later cut off Ms. Victim F, flashlights, radios, portable speakers used to play white noise to reduce the chances neighbors would be awoken by any commotion, wig, OBD equipment, lock cylinders, about 8 stolen taillights/headlights that hadn't sold yet, various other car trim parts, some license plates used in transporting cars, portable

printer used for things like registration tags, IR illuminator, various tools, lighting equipment, supplies to paint and refurbish cars before shipping, "burner" cell phones, and so on.

Some of these items were stolen from homes or cars (including homes on Mare Island), such as the two bose systems, the portable printer, the radar detector, the knife, the wireless router, one of the cameras. The sunglasses case was from a car stolen on Mare Island. The sunglasses themselves were given to Ms. Victim F when she was dropped off, with instructions to wear them so that people would not notice her eyes were taped shut. Mare Island residents, if you recognize something as yours, please contact police and so advise them, to help the victims prove this is not a hoax.

http://www.anony.ws/image/DOcl

The next photo depicts the room where Ms. Victim F was held, taken while she was away in the restroom and the window covering was being readjusted to black out all light. Her prescription glasses can be seen on top of the chest of drawers. (The photo was taken to ask a question about something in a cropped out part of the frame.)

http://www.anony.ws/image/DOc3
http://www.anony.ws/image/DOc9
http://www.anony.ws/image/DOj5

Next are sample photos of wireless router passcodes. There were many more. We chose one from a house on Poplar whose residents knew it was broken into, and one from a house on Tisdale whose residents did not. We are using this particular Tisdale house as a sample because we already mentioned something indicating we had been inside that house (choosing not to take the car of a medical student who was interested in or already enlisted in military service). We also collected MAC addresses, for various reasons. All computers and electronic media with such information, and any cloned hard drives and the like, have been destroyed (except a few items shown in the photograph that will likely be destroyed by the time you read this).

http://www.anony.ws/image/DOce

This photo shoes the logo that was printed on materials to be given to victims, instructing them never to go to authorities. "Keep quiet, be noble and bear your

own suffering. Or your family will." There is good reason Mr. Victim M and Ms. Victim F acted in what might be considered an unusual way. They were made through carefully calculated measures to believe their families were in serious danger.

May God have mercy on us. We expect none from you."

The email header analysis of the above email revealed that it was sent using an anonymous email service. The images attached to the email were stripped of all identifying data. VPD later conducted a follow up investigation into the other crimes committed on Mare Island that were described above and allegedly committed by the UNSUBS. Numerous crimes were confirmed to be committed and the items described by the UNSUBS that were taken during the burglaries, were in fact noted in corresponding police reports taken at the time of these reported crimes.

22. On March 30, 2015, during a forensic examination of VICTIM M's emails provided by LIVE.COM based on the exigent circumstances described above, it was found that VICTIM M was an active contributing member of Nextdoor.com, a website that contains a blog dedicated to community issues on Mare Island, including crimes that occur there. VPD detectives discovered further that the crimes described in the aforementioned email by the UNSUBS were discussed on this Mare Island community page.

23. On March 30, 2015, at approximately 11:41 a.m., the alleged UNSUBS sent the following email to Public Information Officer Lieutenant Kenny Park of VPD, threatening to "attack" him if he does not apologize publicly to VICTIM F regarding an the aforementioned press contact where he stated that the kidnapping was "an orchestrated event and not a kidnapping":

> **From:** mareislandkidnappers [mailto:mareislandkidnappers@gmail.com]
> **Sent:** Monday, March 30, 2015 11:41 AM
> **To:** Kenny Park
> **Subject:** Victim F apology

"It is inconceivable to us that the air has not been cleared concerning Ms. Victim F's victimization.

The Vallejo police department has 24 hours to issue a full and unequivocal apology, one that includes the words "we were wrong" or something very close to them. No mealy-mouthed "it appears we may have initially mis-assesssed the available evidence due to the complex and bizarre nature of the crime and the unusual behavior of the victims in delaying their reports and retaining attorneys instead of working directly with police." It will be a full apology, with zero insinuation that the victims had any role whatsoever in creating their predicament.

We understand that the police may decide not to disclose some information given to them. On reflection disclosure of it could cause a great deal of harm to Mare Island residents' well-being, not to mention their property values. We certainly don't wish to harm them further and leave that to your judgment.
However, at this point the police have more than enough corroborative information to realize that they were wrong. And yet you still allow Ms. Victim F to be portrayed as an unstable hoaxster.

I speak for myself and potentially for another. When I say I am going to do something, good or bad, it will be done. The police have 24 hours to issue the apology. I frankly don't care how fishy you think this is or that it's inconsistent with anything else you've seen. You at least know by now that the victims were not lying. You have no good reason to continue allowing the community to believe they are hoaxsters. If it is somehow because you want to root out that grow house, it is at [redacted]. It has looked bigger and smaller to us at various times, but we are not the DEA and our equipment is relatively low end. The main grow area looked to be the master bedroom, assuming the house's floorplan was the same as its clones (we did not enter that one). If you are looking for the "dealer" we mentioned, he is in the second house from the end of [redacted]. He wore a hat with a 'P' on it and I think that's what people called him. It could have been another letter, the group made a bit of fun over it and it's how we ended up with our op names L, J and D (no relation to our actual names). So I might be confusing the original. Also, the markings on the envelope did not absolutely mean he was dealing. They were names and amounts, and a few random markiings like adding something up. If he was a dealer, he must have been about as small-time as they come.

If you are delaying because you think you will tease us out of hiding, yes it is true you have kept us (me) communicating with you. But we really do not want to be caught. Even if you manage some sort of egotistical giraffe exploit, you are

dealing with an onion of onions. And we know for a fact that you have not even pierced the first layer because it would require you to physcially be at a relay point.

If you still think this is some sort of an inside job, for example because we seem to have information that only people in the victims' circle have: I think I mentioned that we've broken into a house or two, and that we're pretty good with computers. We use Spector 360, SniperSpy and another similar program. We have quite a few computers that we can utilize in various ways, and even remote into in some cases. We're not building a botnet and for my part I am more hack than hacker. But it's not rocket science to install software on someone's computer, especially when there is no password or the password is on a sticky note right by it. As I mentioned we were looking to diversify, and there are a lot of different things we need outside computers and identities for. All Data subscriptions that can't be traced back to us, as an example. And we have learned a lot from what other people use, such as Merlin Data. Who knew you could get full social security numbers and such a ridiculous amount of other private information about people? And tht reminds me, since the victims and their families have had the police and press and public up in their business for days, I think it is only appropriate, Mr. Park, if the public has as much information about you, in case they'd like to get in touch and let you know what they think about your victim-blaming, and your failure to do the right thing and issue a full apology when you had the chance.

I have spent time doing to the wrong thing for the wrong reasons. If you force it I will do the wrong thing for the right reasons. No, not another kidnapping. You will see. There will be a lag before you find out, but after 24 hours it will be in motion, if there is no full apology. I/we may be the direct agent of harm. But it will be made crystal clear that the Vallejo police department, and you, Mr. Park, had every opportunity to stop it. You have more than enough information at this point to do the right thing and issue an apology to the victims.

You have until noon tomorrow to make that happen."

Email header analysis revealed that the email was sent using the Singapore-based anonymous email service anonymousemail.com. The aforementioned "From" line was entered by the sender.

41

24.     On March 31, 2015 at approximately 7:11 a.m., another email was received by Lt.

Kenny Park:

> From: Anonymous Remailer (austria) <mixmaster@remailer.privacy.at>
> Sent: Tuesday, March 31, 2015 12:51 AM
> To: Kenny Park
> Subject: Victim F case
>
> "This is the last message we (I) will transmit for at least several months.
> First, it was wrong to issue an ultimatum. We will not attempt any sort of further
> damage or harm. To do otherwise would disregard and dishonor the one positive
> thing we learned from this, that it is not some game and real humans are involved.
> Police do not deserve to be targeted, even ones who make poor calls about how to
> treat victims. And certainly innocent civilians do not deserve to be in harms way,
> nor to have their property harmed, nor even to have their sense of security eroded.
> We will break no more laws. We will directly publish information about what
> happened on the internet tomorrow at 12pm, if no statements are made fully
> exonerating the victims. If Vallejo PD would like to get out ahead of the story
> then it may make a statement and do so. The statement only needs to exonerate
> the victims, it does not need to mention us nor that we wished them to be cleared.
> You can simply say you have new information indicating the victims have in fact
> suffered a terrible ordeal, and that you are focusing all resources on bringing to
> justice those responsible for the horrific crime, something to that effect. We
> really don't want to be part of the story. But if it is not put out there in a way
> making it clear the victims were wrongly accused, then we will do what we can to
> rectify it directly.
>
> To address a few loose ends and continuing doubts:
> Why would we try to clear the victims when (a) we're criminals who shouldn't
> care, and (b) it puts us at risk?
>
> I suppose the cynical answer that perhaps police will find most plausible is that
> we don't think you will manage to identify us, so it's not that risky. We also don't
> plan to operate further, so disclosure of our MO is not an issue. The biggest risk
> we took was any mention of the outside group we worked with. I guess that
> genie's out of the bottle, but I will add that I don't think this was that big an
> operation in the scheme of things, nothing like the Newark or Houston busts, and
> certainly nothing besides cars and some parts. Aside from continuing to blame
> the victims, the only thing you can do that would make us act out is something
> like a gambit to make that group think we are cooperating with you and giving

their information. That sort of lie could put our families and friends at risk--
innocent people--and if LEA stoops to that, then yes, we will defend our own
however we have to. Anything after delivery is pretty much a black box to me, I
have no idea how tight that oper ation is nor how easily exposed. All I know is
that if you decide to use innocent people as pawns, I don't think that is going to go
well for LEA.

Take the cynical answer if you want, but mostly it was because we feel deep
remorse over what we did and anger toward the Kafka-esque response of the
justice system toward the victims. We had disagreements over how much to
reveal and how to do it. But we all agreed something had to be done.
Ransom money I keep seeing how odd it is that it would be so low. Again, we
were trying to stay well under anything that would generate a report. The report
would draw more scrutiny from the bank. They have to fill out paperwork, it's
just a fact that they're going to give the situation an extra thought or two while
doing it. And if efforts to prevent the victims from reporting the crime are
successful, we did not want an IRS inquiry upsetting that status quo later and
bringing everything up for the victims again.

This operation was not about the money. We were not doing so well for ourselves
that $8500 was chump change, but it was the training we were after. We needed a
live fire exercise before taking on a hard target, to learn how people react and iron
out all of the wrinkles. (We were obviously right about that.) The money as a
share of Mr. Victim M's income and assets was also roughly proportionate to the
amount of a high-worth target's wealth we planned to demand. We were already
surveiling targets. We used Merlin to seek out net worth.

Drone

The drone is not weaponized. We ground-tested the flare system and that is all.
The rails and equipment have been destroyed. It was goiing to be a last resort,
and then only if someone could call dispatch and warn that the helicopter would
be fired upon if it did not leave, with a link to a video showing what the drone
could do. But we did not go through with it. The most we could do now is run it
into something.

As an aside, something should be done about drones. It's going to take one
radicalized geek plus a bunch of easily available systems and parts to do some
real damage--physical and psychological. It's an important innovation, I saw that
Amazon just got its go-ahead to test outdoors. But these ought to be regulated. A

year ago, before understanding the possibilities, I'd be the last person you ever heard say that. DJI stuck its neck out--yes in part to mitigate the White House Phantom flyover mess--and is getting hammered in the community for including flight limits in Inspire firmware updates. That should be standard at very least on that sort of high performance plug-and-play airframe, and it shouldn't be left to. the market to make it happen. Also, the whole "line of sight" rule is widely flouted and high powered radio equipment is readily available, FCC permit or no. We flew ours as far out as Crocket Hills regional park with video still pretty solid, and could have gone fur ther if we hadn't been worried about losing so much work and money. Nothing would keep us from flying it into AT&T stadium with a payload of God knows what. Unless someone is already secretly on top of this, maybe that's the reason for the otherwise useless stadium TFRs (how would there ever be time to intercept?). It's high time for some sort of DARPA challenge on disabling or shooting down small drones over populated areas. We already kicked around several ideas, I'm sure the real wizards can do better.

Other victims

We want to make sure that you don't end up subjecting any innocent people or families to 17 hour interrogations. To that end, please know that there was no reason for the choice of homes/people we revealed other than operational considerations or happentance. We found cash while we were in the Poplar home. If we were going to take that and reveal that we had been there, we figured we might as well take other things we wanted, too. It would be insured. For the Klein vehicle, we needed that one for an order, there is about a $5000 premium. For the Tisdale vehicle, as mentioned we didn't really need it or at least it wasn't good timing. But he seemed a little full of himself and we had also seen/heard the car around a couple of times and thought the kid should have his toy taken away. And since we were going to do that, we took a few things from the house too, though not very much. The other two places we revealed were just samples that came to mind, the other one on Tisdale I suppose because we were in it around the same time and the two students seemed like such a contrast to each other. The Sundance place I suppose was to show that this had become a game for us. I mentioned that people called the guy "P" - we don't know him. The person spotting for the one of us running up the stairs heard it in conversation in the living room. And we will tell you again that Victim F was completely out of the blue. More so than anybody else, there is zero connection.

Offer

I am sure you will want to spend some time fishing to see what you can come up with before resorting to this offer. But a few months from now I will check back in. As you can probably tell, I am primarily responsible for this operation going through. If I am convinced that the other people involved can be given immunity--anonymously--for any kidnapping, auto theft or related crime, I will turn myself in and provide a full confession. I will also turn over any remaining equipment (I know I should but it's very hard to throw away things like a custom drone and gen 3 night vision). Now, I am not stupid. I have read all about the ways in which people get screwed on immunity. So at a minimum this is going to involve attorneys for all three of us--actual criminal attorneys in private practice who we can look up online (not a police imposter), representing each person individually--reviewing agreements with every level of government that might be able to prosecute us. I don't even know if this is legally possible, but I do know that I will take every precaution, and then take it again, to make sure what is bargained for is delivered. It will also have some sort of explicit statement that I am not required to provide information about anybody we worked with. I don't even want to be asked. From where I sit, this is a good deal, unless it turns out I'm sitting under a black helicopter or something else out of left field I never saw coming. Consider it, and have some sort of framework in mind if you like. When the time comes, there will be one chance at this: If something smells wrong, I will be in the wind for good. And the deal will have to be struck before names are provided of course. It can include some provision that the beneficiaries don't have a prior record (in other words, so that you're not handing a blank check to someone who turns out to be a murderer at large). It is a serious offer, not lightly made, and one that I hope I will have the courage to go through with after enjoying a few last months of freedom. If it comes down to it I'm willing to live off the grid and read books for the rest of my life. If it means a second chance for someone I think deserves it, or if it means hope enough to sustain someone I have wronged, then I should be willing to read books behind bars.

Goodbye

That is all I can think of. We are deeply sorry for the pain that this has brought everybody. Including the police and their families. It ends now. For what it's worth, what could have ended up as a prolific and dangerous criminal group has disbanded. And you have Victim F to thank for it. So stop persecuting her. I don't think you will find us, but if you do, good work. You may already have done one of us in, another has had a nervous breakdown, and for my part you definitely have me looking over my shoulder and jumping at shadows. I think I'll only find peace if I move to the middle of nowhere or go overseas and teach

English or some such. If you do manage to pull me out of a hole someday, good job, well-played. I'm not going to hurt anybody. But depending on where I am at that moment in time, I might have another spray painted squirt gun. Or maybe it will be a real gun, empty. Or maybe not empty. Don't think too hard about that, just aim true and get it done.

If it ever comes to that."

Email header analysis revealed that the email was sent using a Austrian based anonymous email service. The aforementioned "From" line was entered by the sender.

25.     On June 23, 2015, at 2:03 p.m., your affiant received notification from Vallejo Police detectives that Alameda County Sheriff's detectives were currently investigating a home invasion that is similar with the kidnapping of VICTIM F.

26.     On June 25, 2015, at 1:00 p.m., SA David Sesma and your affiant met with Alameda County Detective Miguel Campos and Detective Sergeant Rafael Alvarez at the Dublin Police Services Station located at 100 Civic Plaza, Dublin, California to discuss their investigation and its relation to ours.

27.     On June 5, 2015, at approximately 3:34 a.m., Alameda County deputies responded to North Terracina Drive for a report of a home invasion style robbery. Upon arrival and initial investigation deputies learned that an unknown male suspect (hereinafter referred to as UNSUB) forced entry into the home by prying open a secured screen off the window frame and entered through an unsecured window. Once inside, the UNSUB walked upstairs to the second floor where the homeowners were asleep. The victim homeowners (husband and wife) awoke to a white adult male standing at the foot of their bed, with a flashlight shining in their faces. The UNSUB calmly ordered the victims to turn on their stomachs and to place their hands behind

their backs. The UNSUB also told them that their young adult daughter who was asleep in her bedroom was unharmed. As the UNSUB leaned in to restrain the male victim with plastic "zip-ties", the victim fought back. During the struggle, the UNSUB struck the male victim in the head with a hard object, believed to be a metal flashlight, which caused a large laceration to his head. The female victim fled to the bathroom and locked herself in with her cell phone. While the male victim continued to fight with the UNSUB, the female victim called "911". The male victim and the UNSUB continued to fight for approximately "four minutes" until the UNSUB fled the residence. A cell phone was located on top of a cabinet in the second floor hallway. According to the victims, the cell phone did not belong to anyone in the residence and was not there before they went to sleep. When police arrived several items were located in and near the property. Among the items located were plastic "zip-ties", 6" of duct tape, a fabric glove, and the aforementioned cell phone. After the cell phone was recovered, it was determined that the phone was locked by means of a screen pattern-lock and no information could be recovered from physical examination of the phone. An emergency "911" call was placed from the lock screen of the phone, which revealed the phone's telephone number to be 916-500-8047 at the California Highway Patrol's Dispatch Center.

28.    On June 5, 2015, detectives obtained a search warrant for the cell phone, a SAMSUNG GALAXY NOTE 4 (IMEI# 990004824579217), which was faxed to VERIZON WIRELESS who later provided that the subscriber of the phone was a person who lived at 5300 Mississippi Bar Drive, in Orangevale, California. The UNSUB was described by the victims as a white adult male, approximately 20-30 years of age, fit, approximately 5'10" tall, and dressed in dark colored security guard outfit. A check of ACCURINT (law enforcement database) by Alameda County Sheriff's detectives revealed that the cell phone subscriber in Orangevale did

not meet the age or physical description given by the victims. However, the search through

ACCURINT also showed that MATTHEW MULLER was associated with the Orangevale

address. A photo of MATTHEW MULLER was located in the DMV Cal Photo system where his

physical description was consistent with the suspect description provided by the victims. (On

June 26, 2015 a review of the still photos obtained from the TARGET retail store in Pleasant

Hill, California, that depicted a white athletic male purchasing the aforementioned

TRACPHONE that had been used to attempt to contact VICTIM M, is also consistent with the

physical description of MULLER. A criminal history check of MATTHEW MULLER by

detectives revealed that he was a subject in a burglary, criminal threats, robbery, and attempted

sexual assault investigated by the Palo Alto Police Department (case# 09-5866), but no arrest

was made in that case. Detectives then contacted the occupants of 5300 Mississippi Bar Drive in

Orangevale and spoke to a person who identified herself as MATTHEW MULLER's mother.

She was provided with a description of the cell phone, along with the cellular number associated

to it to help detectives identify who it belongs to. She advised detectives that the cell phone

belonged to her son MATTHEW MULLER, who had told her that he had lost it earlier that day,

(June 5th). Detectives were told that MATTHEW MULLER mainly resides at their South Lake

Tahoe property located at 2710 Genoa Avenue in South Lake Tahoe, California, (which is within

the aforementioned 200 meters of Grid Coordinates 38.915361, -119.967021, which is the

calculated location received from AT&T where the three (3) TRACPHONE calls to VICTIM M

were made from). A check in DMV and ACCURINT revealed that MATTHEW MULLER's

current address is 5300 Mississippi Bar Avenue in Orangevale, California, and the South Lake

Tahoe address is owned by the same person who is the Verizon cell phone subscriber on the

recovered phone.

48

29.     On June 7, 2015, detectives contacted the El Dorado County Sheriff's Office (ECSO) to inquire about the South Lake Tahoe address and learned of a stolen vehicle in which the ECSO had located that morning close by that exact address where it looked as if someone was trying to hide it from public view. EDCSO advised the white 2011 Ford Mustang only had a rear license plate and the steering column had significant damage, therefore a check utilizing the vehicle identification number was conducted, which revealed that it was stolen out of Vallejo, California on January 3, 2015, (Vallejo PD Case #15-85), and was registered to a person residing in Vallejo, California, (on a street name consistent with the previously mentioned stolen Mustang in the alleged abductors aforementioned emails sent on March 28, 2015, as one of the vehicles stolen by the group responsible for the VICTIM F kidnapping). ECSO further advised Alameda County detectives that upon search of the vehicle MATTHEW MULLER's driver's license was located under the front seat as well as other indicia associating the vehicle to MATTHEW - MULLER. With the above information, Alameda County Sheriff's detective obtained a California State "Ramey" arrest warrant for MATTHEW MULLER, and search warrants for the stolen white 2011 Ford Mustang, and the residences 2710 Genoa Avenue in South Lake Tahoe, California, and 5300 Mississippi Bar Drive in Orangevale, California.

30.     On June 8, 2015, at approximately 7:15 a.m., Alameda County Sheriff's detectives conducted the search warrant at 2710 Genoa Avenue in South Lake Tahoe and located MATTHEW MULLER in the hallway upon entry and placed him in custody without incident. Upon observation by detectives, the residence was in untidy where sporting equipment, men's clothing, leftover food, and other household items were discarded on the floor. There were several evidentiary items seized by detectives, but most noteworthy was an ASUS laptop, model U50F, bearing serial number 9CNOAS112103500, the same brand laptop that was reported

stolen by VICTIM M during the kidnapping of VICTIM F ; black colored digital vehicle key

maker, numerous blank car keys, and a pair of two-way radios, all three of which were depicted

in a photo attached to one of the alleged kidnapper's aforementioned emails sent on March 28,

2015.

31.    At approximately 8:15 a.m., detectives interviewed MATTHEW MULLER where

prior to investigatory questions he volunteered answers pertaining to his personal information.

MULLER advised that he is a former Marine who served from 1995-1999, attended Harvard

University from 2003-2006, and taught at Harvard from 2006-2009. (I later noted on the website

of the California Bar that Matthew D. Muller, CSBN 275832, attended Harvard Law School, was

admitted to the California Bar in 2011, and was disbarred in 2015.)  MULLER further advised

detectives that he suffered from Gulf War Illness, problems with psychosis, and in 2008 was

diagnosed with Bipolar Disorder. MULLER was then transported by detectives to BARTON

MEMORIAL HOSPITAL located at 2170 South Avenue in South Lake Tahoe, for the execution

of a California State DNA warrant and blood draw, which was taken and submitted as

comparative evidence to the Alameda County Sheriff's Office.

32.    At approximately 12:00 p.m., detectives conducted a search of the stolen white

2011 Ford Mustang at the WELCOME TOW, located at 1772 D Street in South Lake Tahoe,

which revealed numerous evidentiary items, but most noteworthy was a black military-style belt

with two ammunition-style pouches that contained swim style goggles that had tape covering the

lenses, which upon view had a long blonde hair stuck in the duct tape (VICTIM F had long

blonde hair) and was consistent with the swim goggles VICTIM M and VICTIM F described

having to wear during their encounter; found in the trunk of the Mustang was a super soaker type

water pistol that had been spray-painted black and had a flashlight and laser pointer taped to it, which is the same one that was attached to one of the aforementioned emails sent by the alleged kidnappers of VICTIM F on March 26, 2015; an LG cellular trac-phone bearing serial number 412CQSF2045454, which when searched by detectives revealed the same photo of the water pistol that was attached to the alleged kidnapper's aforementioned email sent on March 26, 2015; another set of speedo swim goggles; four sets of zip ties; and when a search of the car's navigation system's "history" was conducted, "Utica St. Huntington Beach, CA" was one of the locations, which is where VICTIM F was dropped off on March 25, 2015.

33.   The law enforcement officers who executed the June 8, 2015 search at 2710 Genoa Avenue in South Lake Tahoe were not investigating the Vallejo crime. SA Sesma and I have spoken with them and learned that they saw but did not seize numerous evidentiary items relating to the Vallejo crime remaining in the residence, such as burglary tools pictured in the attached photos in the aforementioned emails, window barricading material, evidence that a female had resided in the residence, various computer equipment, electronic surveillance equipment, and other evidentiary items relating to the abduction of VICTIM F. As of this writing, Muller has been in custody since the time this residence was searched and he was arrested, and thus has not had a chance to return to the residence to sequester or destroy this evidence.

34.   On June 26, 2015, a representative of Best Buy in Glendora, California confirmed that on June 24, 2010, Victim M had purchased an Asus laptop of the same model as the one seized from Muller's South Lake Tahoe residence. Also on June 26, 2015, VICTIM M was briefly interviewed and shown a picture of the Asus seized from Muller's residence. With the

understandable proviso that a lot of computers look alike, Victim M said that the seized computer looked like his.

35.    The U.S. Attorney's Office advises me that intrastate use of a telephone is use of a facility or instrumentality of interstate commerce. *See United States v. Nader*, 542 F.3d 713, 719 (9th Cir. 2008); *United States v. Dela Cruz*, 358 F.3d 623, 625 (9th Cir. 2004). So is intrastate use of a car. *See United States v. Oliver*, 60 F.3d 547, 550 (9th Cir. 1995). The Internet is an instrumentality of interstate commerce. *See United States v. Tello*, 600 F.3d 1161, 1165 (9th Cir. 2010).

36.    The vehicle described in Attachment A-2 was seized in South Lake Tahoe and brought to Dublin. FBI has taken custody of the vehicle and are currently towing it to the FBI's offices in Sacramento. The agents transporting the vehicle have advised me that they have passed through Davis, California, and thus they are already in the Eastern District.

## CONCLUSION

I submit that this affidavit establish probable cause to believe that Matthew Muller violated 18 U.S.C. § 1201 and that evidence of his crime will be found in MULLER's residence located at 2710 Genoa Avenue in South Lake Tahoe, California, and the white 2011 Ford Mustang bearing Vehicle Identification Number 12VBP8FF7B5122050, which are detailed in Attachments A-1 and A-2. In my training and experience, and in the training and experience of my colleagues, Attachment B describes items likely to be evidence and instrumentalities of kidnapping.

//

//

//

//

//

52

## SEALING

I intend to attach this affidavit to the Search Warrant and serve it with the Search Warrant.

For now, I ask that all of the materials associated with these applications be filed under seal, except the arrest warrant for Matthew Muller. At this writing, Muller is in custody on the Dublin case. If Muller or anyone acting with him should learn in advance that law enforcement intend to re-search the South Lake Tahoe residence, evidence might be sequestered or destroyed before we are able to seize it.

Respectfully submitted

Jason R. Walter
Special Agent, FBI

Subscribed and sworn to

Before me on June 29, 2015,

Hon. CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

Approved as to Form:

MATTHEW D. SEGAL
Assistant United States Attorney

53

## ATTACHMENT A-1

The property to be searched is 2710 Genoa Avenue, South Lake Tahoe, California, 96150.  It is further described as a single-story, single-family residence located in a residential neighborhood. The residence has green exterior siding with white trim and what appears to be a grey composite roof. The numbers 2710 are affixed to the right of the front door in white placards.  The property to be searched includes all rooms, attics, cellars, lofts, storage areas and other parts therein, and the surrounding grounds and any storage rooms or out buildings on the property.



## ATTACHMENT B

Evidence of violation of 18 U.S.C. § 1201 as described in the attached Affidavit, including:

1. Hairs
2. Fibers
3. DNA
4. Blood
5. Fingerprints
6. Indicia of ownership
7. Bindings
8. Tape
9. Curtains
10. Sheets
11. Bedding
12. Night stands
13. Gloves
14. Lasers
15. Flashlights
16. Goggles
17. Headphones
18. Pillows
19. Nyquil
20. Medicine
21. Pill Bottles
22. Recording devices
23. Cameras
24. Video Cameras
25. Computer equipment
26. Hard Drives
27. Thumb Drives/USB Drives
28. Routers
29. Web cams
30. Stored data on any GPS device indicating locations searched, directions given, and locations traveled to and/or through
31. Any written or electronic document referring to Denise Huskins, Aaron Quinn, Henry Lee, Kenny Park, Andrea Roberts, Vallejo Police Department, or the FBI.
32. Any written or electronic document related to planning or execution of any home invasion, kidnapping, or theft, as well as any "workup" of personal information any potential victim

SEALED

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| SINGLE STORAGE UNIT #585 | ) |
| LOCATED AT 2033 BROADWAY STREET | ) |
| VALLEJO, CALIFORNIA 94589 | ) |
| | ) |

Case No.   **2: 1 5 - SW - - 3 8 2**   **CKD**

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the          Eastern          District of          California *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before   7/15/2015   *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for          days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of

Date and time issued:   7/1/2015   10:45 am

City and state:     Sacramento, California

Carolyn K. Delaney, U.S. Magistrate Judge
*Printed name and title*

*Judge's signature*

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____     _____
Signature of Judge                                        Date

## **ATTACHMENT A**

The following storage unit:

Single storage labeled as unit #585

Located at:

2033 Broadway Street, Vallejo, California 94589

## ATTACHMENT B

Evidence of violation of 18 U.S.C. § 1201, including:

1. Hairs
2. Fibers
3. DNA
4. Blood
5. Fingerprints
6. Indicia of ownership
7. Bindings
8. Tape
9. Curtains
10. Sheets
11. Bedding
12. Night stands
13. Gloves
14. Lasers
15. Flashlights
16. Goggles
17. Headphones
18. Pillows
19. Nyquil
20. Medicine
21. Pill Bottles
22. Recording devices
23. Cameras
24. Cellphones
25. Video Cameras
26. Computer equipment
27. Hard Drives
28. Thumb Drives/USB Drives
29. Routers
30. Web cams
31. Stored data on any GPS device indicating locations searched, directions given, and locations traveled to and/or through
32. Any written or electronic document referring to Denise Huskins, Aaron Quinn, Henry Lee, Kenny Park. Andrea Roberts, Vallejo Police Department, or the FBI.
33. Any written or electronic document related to planning or execution of any home invasion, kidnapping, or theft, as well as any "workup" of personal information any potential victim